**WILSON LINE, Inc. v. UNITED STATES.**

No. 46484.

Court of Claims.

June 28, 1948.

Gerhard A. Gesell and James H. Mc-Glothlin, both of Washington, D. C. (Covington, Burling, Rublee, Acheson & Shorb, of Washington, D. C., on the brief), for plaintiff.

Grover C. Sherrod, of Washington, D. C., and H. G. Morison, Acting Asst. Atty. Gen., for defendant.

Before JONES, Chief Justice, and HOWELL, MADDEN, WHITAKER and LITTLETON, Judges, concur.

HOWELL, Judge.

Plaintiff sues to recover the balance due it as just compensation for the vessel, the State of Delaware, which the War Shipping Administration requisitioned on March 25, 1943. The commissioner of the Court reported a value of $385,136.19, including all consumable stores and expendable equipment on board. Plaintiff claims a value of $555,534.57.

The facts as to the vessel's construction, ownership, operation, and condition are in the main undisputed. The State of Delaware was built simultaneously with a sister ship, the State of Pennsylvania, in June 1923 by the Pusey and Jones Corporation of Wilmington, Delaware, for use primarily as a passenger excursion steamer. The two vessels were built from the same plans and were substantially identical on March 25, 1943, and at all times prior thereto. Pusey and Jones as low bidder was awarded the contract in 1922 to build the State of Delaware and the State of Pennsylvania for the Wilmington Steamboat Company at a price of $529,000 for both. The actual cost of constructing the State of Delaware in 1923 was $387,344, as Pusey and Jones Corporation made no profit, but sustained a loss of $117,944.

The State of Delaware embodied the latest developments in the field of naval architecture and employed a new and advanced method of construction of the superstructure. Ample seating capacity and comfortable deck space was provided and the lifeboat capacity was considerably in excess of the requirements. Wood was eliminated as far as practicable as a building material and new modern and efficient means of fire-fighting were installed to meet any emergency.

The State of Delaware was a steam driven day passenger excursion vessel and had a steel hull with four watertight bulkheads. The superstructure consisted of the main deck, dance deck, lower deck, and boat deck. The main deck was steel and the other decks wood. Each deck was streng-

thened with trussed lattice framing and reinforced with steel stanchions and iron girders. The vessel had approximately 40,000 square feet of deck space and carried approximately 3,400 passengers. She had an indicated horsepower of 2,900 and a speed of 18 statute miles per hour.

There was little change in the basic design of day passenger excursion vessels between the time the State of Delaware was built and 1943 when she was requisitioned by the Government. At the time of the requisitioning the design was efficient and would have been difficult to improve.

Plaintiff is an established concern with long experience in operating excursion steamers and ferry boats on the Delaware River, in New York harbor, and elsewhere in inland waters along the Eastern Seaboard. Among the vessels which the plaintiff owned and regularly used in its business was the State of Delaware which it acquired in 1929 in the purchase of all the assets of the Wilmington Steamboat Company for a lump sum.

The State of Delaware was used exclusively as an excursion vessel. As such, her entire annual operations were in inland waters for only about 100 days during the summer season beginning on Decoration Day and ending on Labor Day. For the remainder of each year she was laid up in fresh water at the plaintiff's yard on Christiana Creek about 2 miles up the Delaware River. Since the State of Delaware was in service only in calm inland waters during the summer months and was laid up in fresh water during the rest of the year she was not exposed to the corrosion and deterioration which severe weather conditions, waves and salt water inflict on vessels engaged in year-round service on the high seas. And because the State of Delaware was actually used only about a quarter of each year, the wear and tear of operation was necessarily far less than that of passenger steamers in service 12 months of the year. Since its vessels were operated only 100 days of the year, it was essential for the Wilson Line to maintain them in such a condition that they could operate them throughout the summer season without a single day's interruption. The Wilson Line kept the State of Delaware in first-class condition. The long lay-up period was used to wire-brush, paint, and clean the vessel, and to put the entire ship in first-class operating condition. Most of this work was done in plaintiff's own repair yard where it could be done at considerably less expense than in outside yards, and in addition to the repair work performed by plaintiff, the State of Delaware was put in drydock at intervals of not less than 2 years in order to keep the propeller, rudder, and bottom of the ship in seaworthy condition.

The State of Delaware had the highest classification that could be granted for that type of vessel by the American Bureau of Shipping. Immediately after it was delivered to the Wilmington Steamboat Company by the builder, the owner expended $33,937.13 for new capital improvements, and between 1924 and 1941 the Wilmington Steamboat Company and plaintiff spent an additional $12,252.65 for betterments, which included decorations, a bar, entertainment equipment, and cooking facilities.

On March 25, 1943, the date of the requisition, the Maritime Commission had a condition survey made of the State of Delaware. The survey covered the entire ship except the exterior portion of the hull lying under the water. Except for three minor items, it was found the vessel was clean, well painted, and in good condition throughout.

On June 10, 1943, a representative of the American Bureau of Shipping made a survey of the State of Delaware while she was in drydock, in order to ascertain the condition of the rudder, sea valves, tail shaft, and bottom of the vessel. The surveyor found that she was in good and seaworthy condition and fit to retain her classification in the American Bureau of Shipping.

The State of Delaware was requisitioned by the defendant for use by the Rubber Development Corporation in procuring rubber in South America. After obtaining the vessel, the Rubber Development Corporation had certain additions, alterations, and repairs made to the vessel at a total cost of $79,259.06, of which $60,787.03 was expended for additions and alterations necessary to enable the vessel to make the voyage to Brazil and to adapt her for special

824

use in the rubber procurement program. The remaining $18,472.03 was spent for repairs of the type that plaintiff would normally have been required to make, but the majority of such expenditures would not have been made by plaintiff before September 1943, at which time the vessel was due for drydocking.

Immediately after requisitioning the vessel, the defendant had the insurance increased to $500,000. This coverage was for 30 days when the State of Delaware was in shipyards in preparation for the prospective overseas operation. The $500,000 coverage did not include any war-risk insurance or insurance for the voyage to Brazil. For that voyage the Rubber Development Corporation, an agency of the defendant, originally procured insurance on the State of Delaware in the amount of $350,000, but while the ship was en route to Brazil increased the insurance to $782,-000.

Since the State of Delaware and the State of Pennsylvania were completely interchangeable ships at all times prior to the requisition, as to type of service, speed and number of passengers, they had the same value. During the summer season from 1936 through 1941 the State of Delaware operated in New York harbor, whereas the State of Pennsylvania operated on the Delaware River. In the summer of 1942, the two vessels were employed in a combined operation on the Delaware River. Therefore, a fair computation of the profit attributable to each vessel during 1942 and earlier years is the average profit of both.

The average annual net operating profit for the State of Delaware for the 7-year period from 1936 through 1942 was $39,-329.28 and that for the State of Pennsylvania during the same time was $72,718.95, or an average per ship of $56,024.12. These figures do not include any deductions for indirect costs or overhead expenses incurred by the plaintiff in the operation of its fleet of excursion vessels. Deduction of such costs and expenses would reduce the figures appreciably.

There has been an effort to attribute a certain portion of indirect costs and administrative expenses to the State of Delaware, although there is no evidence from which the indirect costs and administrative expenses attributable to the operation of the sister ship, the State of Pennsylvania, can be computed, except for the fiscal year ending March 31, 1943. As pointed out above, the ships were completely interchangeable at all times as to type of service, speed and number of passengers, and it appears from the evidence that during most of the time the State of Pennsylvania was employed in more profitable operations than that of the State of Delaware.

The base period which was employed in determining the average annual net profit from the State of Delaware was from 1936 to 1942. It is therefore impossible to determine the net profit of the State of Delaware without averaging annual net profits from the two vessels for the base period of 1936 through 1942 and further assuming that the indirect costs and administrative expenses attributable to the operation of the State of Pennsylvania were the same as those allocated to the State of Delaware.

There were no sales of vessels comparable to the State of Delaware sufficiently near the date of requisition to establish a market price for such vessels. During the year 1943 there was a demand for excursion steamers but their operation was profitable, and owners, including the plaintiff, were unwilling to sell. Instead the plaintiff continued to operate its excursion steamers profitably on the Delaware River and elsewhere and had the State of Delaware not been requisitioned by the defendant, the plaintiff could have used her profitably in its business in 1943 and thereafter as it had in the past.

The main problem is that of fixing a value for the State of Delaware which represents just compensation to its owner. Several guideposts have been considered in cases involving a similar question and as a general proposition it is not a matter of formulas but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts. The matters which enter into a consideration of this kind are cost of reproduction, cost of construction, acquisition costs so far as relevant, improvements, replacement costs, depreciation, earnings, physical condition, appraisals for insurance or other purposes,

and any other relevant facts upon which a reasonable judgment for value can be based. (Rule 2 of the Rules submitted to the Director of the War Shipping Administration on December 7, 1943, by the Advisory Board appointed by the President of the United States.)

This court, other federal courts, and other authorities are all in accord with the rule that reproduction cost, less depreciation, is one of the principal gauges of value when market price is absent. Trailerships, Inc. v. United States, 1946, 66 F.Supp. 595, 106 Ct.Cl. 215; The President Madison, 9 Cir., 91 F.2d 835; The Hisko, 2 Cir., 54 F. 2d 540; The Manhattan, D.C., 10 F.Supp. 45, affirmed 3 Cir., 85 F.2d 427, certiorari denied 300 U.S. 654, 57 S.Ct. 432, 81 L.Ed. 864; In re United States Commission, 54 App.D.C. 129, 295 F. 950, certiorari dismissed 265 U.S. 598, 44 S.Ct. 634, 68 L.Ed. 1199; The Petar, D.C., 68 F.Supp. 296; 1 Bonbright: Valuation of Property, 337–344 (1937).

█ It seems that in this case it is particularly appropriate that a proper valuation be determined primarily upon the basis of reproduction cost, less depreciation, because of several factors.

The State of Delaware was not the ordinary ocean-going ship nor even the ordinary day passenger excursion vessel. Her design was efficient and difficult to improve. Her only operations were in calm inland waters each summer and the remainder of each year she was laid up in fresh water under the constant care of her owners. Throughout her life the State of Delaware had received careful attention and had been maintained in higher-than-average condition. As a matter of fact, we have found that the vessel was kept in first-class condition and did not deteriorate as rapidly as a vessel in year-round ocean service and was in better condition than the average ship of equal age engaged in the same type of service. Because of all of these facts, the vessel's deterioration in value due to age was much less than that of the average vessel, even the average excursion vessel.

We turn now to a determination of the cost of reproduction. The figures as adduced by witnesses for both the plaintiff and defendant range from $600,000, subject to certain adjustments downward, to $1,013,750. The highest value was of course submitted on behalf of the plaintiff by Edward A. Hodge, Vice President in Charge of Shipbuilding of Pusey and Jones Corporation. The low figure was submitted on behalf of the defendant by Francis A. Martin, an authority on ship valuations.

A review of the testimony of the various witnesses on behalf of the plaintiff shows a variation of from $1,013,750 down to $842,101. A review of the testimony offered by the witnesses on behalf of the defendant discloses a range of from $600,000 subject to adjustment downward, up to $842,000. In the case of two witnesses, the testimony as to the cost of reproduction on behalf of both the plaintiff and the defendant is in agreement.

█ This court, as well as other courts, has had considerable to say with reference to testimony of expert witnesses. In the case of Oliver J. Olson and Co., a corporation, v. United States, 71 F.Supp. 355, 356, 108 Ct.Cl. 581, 594, in the course of the opinion by Chief Justice Jones, it is said: "As usual the opinions of the experts differed widely. Plaintiff's expert, Captain Pillsbury, said the value was not less than $325,000; the defendant's expert, Captain Jeans, placed the value at approximately $200,000. This is about the only conflict in the testimony. The circumstances are generally agreed upon. These are factual. But the expert witness lives in a different realm. Hs is not limited to the facts. He may give his opinion. He sometimes deals in hypotheses and postulates. He is sometimes not even hampered by the facts. Somewhere in this shadowland of blended truth, opinion, and imagination the court must undertake to ascertain the real facts."

In our consideration of all the facts, it appears to us that the figure of $842,000, upon which the witness on both sides agreed, is a fair valuation upon which to base our determination.

It now devolves upon us to determine the years of useful life, deduct therefrom the age of the vessel at the time of its requisi-

tion, and determine its remaining years of useful life. In making this determination we find that the testimony of the witnesses is also very much in conflict, with estimates of from 30 to 60 years of useful life. This question, of course, is one which is purely a matter of opinion and obviously based upon a combination of factors which include among other things the type of use to which the vessel was put and the nature of maintenance and repair throughout its use. There is no question but what the State of Delaware was well constructed in the beginning and properly cared for and maintained in an exceptional manner. Just how many years of useful life this would add to the vessel cannot be accurately determined but it is perfectly obvious that this vessel would last considerably longer than one put to hard usage and not properly cared for and maintained.

After careful consideration of these matters, it is our determination that the vessel had a useful life of 45 years and that therefore a proper valuation of it at the time of its taking must be based upon its remaining useful life of 25 years.

The next factor to be considered before arriving at a final determination of value is the rate of depreciation to be employed. Three different proposals were made by the various witnesses, ranging from the Martin scale which employs a 5 percent rate on a diminishing balance, to the 2½ percent rate on the diminishing balance offered by plaintiff's witnesses, Donald and Haight. It is to be noted that the Martin rate applies to all passenger and cargo vessels wherever operated and was recently considered and rejected by a federal court, The Petar, D.C., 68 F.Supp. 296, in the case of an ocean-going vessel.

The second proposal offered by defendant's witness Rutland involved a depreciation rate of 2½ percent on a straight-line basis, which rate was equally applicable to all excursion vessels, ferry boats, and boats of a similar type. The Rutland proposal is similar in one respect to that of the Martin proposal in that it does not take into account the favorable conditions under which the State of Delaware operated and its better-than-average condition when requisitioned.

The third proposal involved a depreciation rate to reflect the lessening in value due to a vessel's age at 2½ percent on a diminishing balance. This method was adopted by the court in the case of The Petar, supra, and was also given approval in application to ocean-going vessels in Standard Oil Co. of New Jersey v. Southern Pacific Co., 268 U.S. 146, 45 S.Ct. 465, 69 L.Ed. 890, and The Hisko, supra.

The State of Delaware had the highest classification that could be granted to that type of vessel by the American Bureau of Shipping and the superiority of her condition was affirmed by every witness who had knowledge of the vessel. Because of the type of operation and careful maintenance of the vessel, it must be conceded that the rate of depreciation was less than on other similar vessels which were engaged in ocean-going operations and subject to much more exposure to corrosion and deterioration which the waves, salt water, and winds of the high seas inflict on ocean-going vessels. Thus, it is not necessary to dispute the opinions of witnesses Sturm and Martin that over a 20-year period an average ocean-going vessel in year-round service depreciates a total of 64.15 percent, at the rate of 5 percent on a diminishing balance because the same depreciation cannot be applied to a vessel in exceptional condition operated for a limited period each year on inland waters. Thus it is that the law requires deduction only for actual depreciation and the extent of that depreciation must be ascertained by evidence based upon the contemporary condition of the vessel. Even defendant's witnesses conceded that different rates of depreciation were proper depending upon the type of vessel, but advocated 2½ percent on a straight-line basis for all excursion vessels and ferry boats. It was also pointed out that this rate was based on a total useful life of 40 years and a zero value at the end of that period. As we have previously found, the State of Delaware had a remaining useful life of 25 years, or a total life of 45 years. The premise for any rate based upon a total life of 40 years is thereby destroyed.

The extent of obsolescence is also relative in the determination of deprecia-

tion. It has been found that there was little change in the basic design of day passenger excursion vessels from the time the State of Delaware was built and 1943 when she was requisitioned by the defendant. Further, her design was efficient and would have been difficult to improve. While certainly there must have been some degree of obsolescence, it was not considerable.

It is our judgment that in awarding a proper premium for the good care and maintenance as well as the comparatively mild type of operation in which the State of Delaware was engaged, a proper depreciation would be at the rate of 2½ percent on a diminishing balance, which, when applied to a useful life of 45 years with remaining useful life of 25 years, would establish the present value of the vessel at 55 percent of the cost of reproduction.

Shortly after the State of Delaware was delivered to its original owner by the builder, the owner expended $33,937.13 for new capital improvements and between 1924 and 1941 the original owner and plaintiff expended an additional $12,252.65 for betterments, aggregating a sum of $46,189.-78. To the sum of $842,000, the value of these capital improvements must necessarily be added and depreciated at the same rate.

There are other matters, all of which must be taken into these considerations and noted at this time. With reference to the demand for excursion steamers, we have found that during the year 1943 there was such a demand, but their operation was profitable to the owners and there were no sales. When the rationing of gasoline limited pleasure travel by automobile, people who desired recreation turned in increasing numbers to steamship excursions as a substitute. Passenger excursion business increased everywhere and continued to improve. According to the evidence, plaintiff received many inquiries from persons desiring to purchase excursion steamers but in each case declined to sell.

Turning now to the question of insurance, the value of the State of Delaware as evidenced by the defendant's insurance coverage was $500,000. This coverage ended before the ship left the United States

and for a brief period it was insured for $350,000, but while the vessel was en route to Brazil the defendant increased the insurance to $782,000.

The cases seem to hold that the insurance value stated in a policy is not relevant in determining the true or market value of any type of property, including vessels, because it may be arrived at for various business reasons and does not represent actual value. The Petar, supra. The theory and practice of insurers and insured is to make the limit of insurance much less than the value of the property, while owners are permitted to procure insurance in amounts far below this limit. The result is that the amount of insurance has no fixed or uniform relation to the value of the property it covers, and hence does not directly tend to disclose its value. Union Pacific R. Co. v. Lucas, 8 Cir., 136 F.374, 377; Adelphia Hotel Co. v. Providence Stock Co., 3 Cir., 277 F. 905; Roscoe, Damages in Marine Collisions, 35.

The earning capacity of the ship at the time of the taking or the profits which have been previously earned are some evidence tending to prove value, but the varying facts of use, business acumen, and management which go to influence this factor, detract from the weight which should be given to this element. Roscoe, Damages in Marine Collisions, 35. As previously pointed out, the State of Delaware was the sister ship of the State of Pennsylvania and throughout the years embraced within the base period during which the earnings were considered, i.e., 1936–1942, was engaged in the least profitable operations of the two ships. Therefore, it is necessary to consider the combined average earnings of the vessels over that period of time.

There was also the matter of the proper allocation of general administrative expenses, overhead, and indirect costs against the revenues of the vessels involved and in making such allocation even defendant's witnesses did not purport to use a uniform method of allocation. If the position of the plaintiff is accepted with reference to such allocations, and the combined annual profit of $56,024.11 per vessel capitalized on a 10-year basis, this would indicate a value

828

of $506,241, and the capitalization on the remaining useful life would yield a value considerably in excess of that sum. If on the other hand the allocations are accepted according to the theory of the defendant's witnesses, the average annual profit attributable to the State of Delaware would be $15,184.06, which would produce a capitalization on a 10-year basis of $151,840.

It appears to us that there are certain varying facts in this particular case which especially detract from the weight which should be given to this element. The necessity for using combined average profits would require a corresponding use of combined average indirect costs and overhead expenses, but it appears from the record that no such data was made available with respect to the State of Pennsylvania for the years 1936–1942. In attempting to find an average figure for 1936–1942, it is necessary to assume that such indirect costs and overhead expenses were the same for each vessel.

It is obvious that the owner of this vessel lost the revenues which the vessel brought in. Consequently, it was relieved of the direct expenses of operating the vessel and they are properly deducted from revenues to determine profits. The plaintiff owned and operated a number of excursion vessels both before and after requisition. Its overhead and general administrative expenses, its costs for clerks, salesmen, terminals, docks, etc., continued after the requisition. In determining what the plaintiff has lost, a deduction of part of such expenses from revenues is warranted only upon proof that after the requisition the plaintiff's expenses were reduced in the amount allocated to the vessel requisitioned. Defendant did not attempt to prove any reduction but instead conceded that certain of the allocated expenses would continue.

In view of the extreme difficulty in accurately determining the earnings of the State of Delaware, under the particular circumstances of this case, we do not feel that a consideration of this factor should be overemphasized.

The real question is the value of the ship as it existed in 1943, and as pointed out above, the important considerations in our judgment would be the cost of replacement, less depreciation, obsolescence, physical condition of the vessel at the time of its taking, and the character of use and maintenance to which it had been subjected.

There is an additional matter which has been submitted for consideration in the determination of just compensation for the taking of this vessel and that is the deduction of all enhancement due to the necessity of her taking. This court had occasion to consider this element in determining whether any part of market value can be excluded when just compensation is being paid. Cors v. United States, 75 F.Supp. 235, 110 Ct.Cl. 66. This case set up certain criteria for such determination, although based on rules long ago settled in Kerr v. South Park Commissioners, 1886, 117 U.S. 379, 6 S.Ct. 801, 29 L.Ed. 924. Shoemaker v. United States, 1893, 147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170; and United States v. Miller, 1943, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336, 147 A.L.R. 55.

As set out by Judge Whitaker in the course of the Cors opinion [75 F.Supp. 238], they are as follows:

"In short, before any part of the market value of a piece of property is to be eliminated, it must appear that it was brought about by the prospect of its condemnation by the Government. So, for the case at bar to come within the rule of the Miller case, it would have to appear that it was known that the defendant had entered upon a project that would probably result in the condemnation of plaintiff's vessel, and that this fact had caused the increase in market value. The outbreak of war alone and the resulting need of the Government for vessels generally do not bring the case within the rule. In addition it would have to appear, at the least, that it was the known program of the Government to condemn all vessels similar to plaintiff's vessel.

"The proof falls far short of this. Many vessels similar to plaintiff's were left in private hands, and it was known they would be. Indeed, the Government itself had disposed of this very vessel seven months before. This was ten months after the out-

break of hostilities. There seemed to be no prospect of its being requisitioned. It is only the enhancement in value due to speculation on account of the imminent prospect of requisition that is to be eliminated."

In the application of this language to the facts before us in the instant case, no deduction from fair value of the State of Delaware can be justified without proof, first, that there was a known program to condemn all vessels similar to the State of Delaware, and, second, that the amount sought to be deducted accrued as a result of speculation on account of the imminent prospective condemnation of the vessel which was part of the program.

The proof in this case falls far short of this. As a matter of fact, it has been well pointed out that one uncontroverted fact in the record is of itself sufficient to take the present case completely outside the scope of the "program" required by the Cors case. The sister ship, the State of Pennsylvania, was also owned by the plaintiff at the time of the war, yet the State of Pennsylvania was never requisitioned, but on the contrary it and several other passenger vessels remained under plaintiff's ownership and operation throughout the war. Any alleged enhancement disclosed by the record in this case resulted from the increased cost of labor and materials which has gone up because of the war. The actual prices and wages prevalent in 1943 were directly under the controls of the defendant at that time. The question of war profiteering, about which Mr. Justice Black spoke in United States v. Bethlehem Steel Corporation, 315 U.S. 289, 62 S.Ct. 581, 86 L.Ed. 855, is not present in this case.

The real question is the value of the ship under the conditions as they existed in 1943. And as pointed out above, the most important consideration in our judgment would be the cost of replacing the ship by its owner.

We therefore find that the sum of $888,000, representing the cost of replacement plus capital improvements, represents the fair value of the State of Delaware at the time of taking; further, that it had a total useful life of 45 years, or a remaining useful life of 25 years, and that depreciation should be at a rate of 2½ percent on a diminishing balance. Since 25 years of useful life remained, 55 percent of the fair valuation at the time of its taking represents $488,400.

To this sum must be added the value of consumable stores and expendable equipment in the amount of $5,534.57, making a total sum of $493,934.57 against which the defendant is entitled to credit for the sums of $119,702.25 paid on October 28, 1943, and $86,547.75 paid on June 21, 1945. To this should be added compensation measured by interest at 4 percent per annum for delay in payment on $119,702.25 from March 25 to October 28, 1943, on $86,-547.75 from March 25, 1943, to June 21, 1945, and on $287,684.57 from March 25, 1943, to date of payment.

It is so ordered.