## PONTIN BOAT CORPORATION v. UNITED STATES.

### No. 48565.

United States Court of Claims.
April 3, 1950.

Linton M. Collins, Washington, D. C., for the plaintiff. Roger Robb and Bingham, Collins, Porter & Kistler, Washington, D. C., were on the brief.

John B. Miller, Washington, D. C., with whom was Assistant Attorney General H. G. Morison, for the defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

Plaintiff sues for just compensation for the requisition of its steam lighter *Chester* by the Government on February 27, 1943. The War Shipping Administration requisitioned title to and took possession of the vessel pursuant to Section 902 of the Merchant Marine Act of 1936, as amended, 53 Stat. 1255, 46 U.S.C. § 1242, 46 U.S.C.A. § 1242. Fifteen months after requisition, on May 4, 1944, the War Shipping Administration offered plaintiff the sum of $25,000 as just compensation for the vessel. On May 9, 1944, plaintiff rejected this offer. Over two years later, on June 20, 1946, representatives of the Administration wrote plaintiff that having reviewed their former valuation they were prepared to recommend to the Administrator settlement in full for an amount of $34,171.91. On June 27, 1946, plaintiff replied by letter indicating its willingness to accept the proffered amount provided the matter could be closed by July 10, 1946, and provided that interest be paid by the defendant on the full amount "at the rate of 3 percent or better" from the time the boat was requisitioned until payment was made. Plaintiff received no response to this letter and defendant never accepted the offer of compromise which was thereafter withdrawn by plaintiff. According to the testimony of officials of the plaintiff corporation, the reason for the willingness to make this compromise was that plaintiff "needed the money very badly at that time." To date nothing has been paid on account of the requisition of the *Chester*.

In 1942, plaintiff was the largest operator of steam lighters in New York harbor, having been in business for over 20 years, and at that time owned six steam lighters operating exclusively in New York harbor.

A steam lighter is a self-propelled vessel similar in some respects to a harbor tug, but usually a little larger, and adapted for freight carrying, but no towing. A lighter is equipped with large decks on which to carry freight and such special capacity ranges from 150 to 200 tons. Its function is to pick up freight at factories or piers along the waterfront and deliver it to steamship piers and other points in New York harbor.

The *Chester* was a single-screw steam freight lighter 112 feet 2 inches in over-all length, with carrying capacity of 300 tons. Among other things, she had a single engine of 350 horsepower, two single drum hoisting engines, a Scotch boiler, two-door, single end, coal burning, 11 feet, 6 inches in diameter and 12 feet in length with 125 pounds steam pressure. Maximum speed was about 10 knots, cruising speed 9.0 knots and her cruising radius 1,598 miles.

Her plates were half-inch steel which were unusually heavy for a steam lighter and she was well and strongly constructed, her frame being 16 inches apart instead of the usual 20, 24 or 26 inches, and every frame was constructed with a reverse angle, an unusual element of strength.

The *Chester* was built in 1908 by the Delaware, Lackawanna & Western Railroad Company at a cost of $56,000. Originally she had a three-inch wood deck and in 1927 this was changed to a steel deck at a cost of approximately $8,000. She was owned by the Delaware, Lackawanna & Western Railroad and operated in and about New York harbor until 1939 when the railroad company took the vessel out of service. Although she had not been in active operation for about three years prior to her purchase by plaintiff, she had been well maintained by the railroad company.

Plaintiff purchased the *Chester* and the steam lighter *Buffalo* from the Delaware, Lackawanna & Western Railroad Company in April, 1942, paying the total sum of $25,000 cash for both vessels. The railroad company sold the *Chester* as surplus because the railroad no longer handled fast freight for which she had been used. The *Buffalo* had not been well maintained and at the time of sale was in a bad state of repair with her economic useful life largely spent. The railroad company would not sell the *Chester* to plaintiff unless plaintiff, as part of the same transaction, also purchased the *Buffalo*. At the time of completion of the sale, plaintiff valued the *Chester* at $23,000 and the *Buffalo* at $2,000. No repair work of any kind was undertaken

by plaintiff in connection with the *Buffalo* which was later sold by plaintiff for scrap at $400.

It was the purpose of the plaintiff to use the *Chester* in its regular lighter business, picking up and delivering freight in New York harbor, and with this in mind plaintiff proceeded to recondition the vessel by installing new guard rails, other woodwork, scaling, painting and other repairs. This work was done for plaintiffs at the yard of its operating company, the Pontin Lighterage & Transportation Corporation at Staten Island, New York, at a net cost of $9,875. The fair and reasonable value of these repairs and improvements if done at a regular commercial yard, with allowance for overhead and profit, was $15,065. The vessel was hauled out and drydocked at Caddell Dry Dock & Repair Company, Inc., in October 1942, and work was done on her hull at that time at a cost of $896.55. Other repairs included new stays at the cost of $263.29, repairing the vessel's safety valve at the cost of $131.10, and scalers for the boilers at $136.70. The total cost of the *Chester* to the plaintiff, including the purchase price of $23,000, and actual expenditures for repairs and improvements, was thus, $34,302.64.

At the time of the *Chester's* requisition, she was almost ready for active operation in the plaintiff's business and the testimony indicated that she would have been in operation within a week or ten days had she not been requisitioned. In October, 1942, the vessel had been inspected by representatives of the Bureau of Marine Inspection and Navigation, Department of Commerce, and their reports which are in evidence showed that the vessel was in good and sound condition, needing only a few minor routine repairs. Practically all the work required to be done by the inspectors had been completed and the vessel was ready for final inspection and testing in order to receive a certificate. The Annual Inspection Report, Hull and Equipment, of the Department of Commerce, relating to the *Chester,* which is also in evidence, bears the notation, "Certificate refused 31 December 1943." This notation, which was made after the Government had seized the vessel in February,

1943, merely indicates that the plaintiff did not ask for final inspection. In other words, because the Government had seized the vessel in February, 1943, plaintiff did not present the vessel for final inspection after the above-mentioned repairs and improvements had been made, and hence a final certificate was not issued.

There were no contemporaneous sales of vessels comparable to the *Chester.* Hence, no determination of a "market price" can be made on that basis. We must, therefore, resort to the other standards which can be applied in fixing the value of the vessel which represents just compensation to its owners. Wilson Line v. United States, 78 F.Supp. 821, 111 Ct.Cl. 764.

The testimony as to the estimated reproduction cost of the *Chester* varied from $159,535 to $200,000, as follows:

| Witness | Reproduction cost | Value of vessel at time of taking |
|---|---|---|
| Theodore E. DeMars, a ship surveyor... | $159,535 ......... | $55,231 |
| Francis A. Martin, a ship surveyor...... | $165,500 ......... | 43,000 |
| Raymond Caddell, operator of a large ship repair business and drydock at Staten Island since 1918, and a qualified appraiser. | $165,000 to $170,000 | 51,750 |
| Admiral Edmond J. Moran, a witness for defendant...... | $185,000 to $200,000 | 35,000 |

DeMars applied a depreciation rate of 3 percent on a diminishing balance to arrive at a fair and reasonable value of $55,231.00. Francis A. Martin applied a rate of 5 percent on a diminishing balance and then added $15,000, the value of the betterments installed by plaintiff, to reach a fair and reasonable value of $43,000.00. See Wilson Line case, supra, 111 Ct.Cl. at page 781, 78 F.Supp. at page 826. Caddell applied a rate of 2 percent on a straight line depreciation to reach a fair and reasonable value of $51,750.00. Admiral Moran estimated that the value of the *Chester* was $35,000, which sum represents what the plaintiff paid for

her plus the cost of improvements. He characterized his own testimony by saying, "What I said was it would be the value of the lighter determined under Section 902 of the 1936 Act, as amended." Obviously, this figure represents the cost of acquisition plus repairs.

There was other testimony offered on behalf of not only the plaintiff but the defendant as to the value of the vessel which we briefly note. Victor Bendix, a ship broker, testified that in February, 1943, he could have sold the *Chester* for $75,000. Frederick Pontin and Elmer Pontin, for many years President and Vice President and Treasurer of plaintiff corporation, testified that in their opinion the *Chester* was worth $68,000.00. One George Schneider testified for the defendant that in his opinion the vessel was worth $10,500, but his appraisal was characterized as "absurd" and "ridiculous" by Admiral Moran.

There was considerable testimony offered with reference to the potential earnings of the *Chester*. The approximate average daily profit earned by the lighters owned by the plaintiff and operated by its operating company, Pontin Lighterage & Transportation Company, for the five years preceding 1943 are set out in our Finding 11. These calculations include all of the lighters operated during the years in question. Some of the lighters included were inferior to the *Chester* in earning power as they were smaller and not in good condition. The revenue which a lighter can earn varies directly with its carrying capacity and the inclusion of the smaller lighters in this computation is not especially fair to the *Chester* which was a 300-ton vessel. The testimony with reference to the remaining useful life of the vessel as of 1943 was as follows:

Frederick Pontin ......... 20 to 25 years.
Raymond Caddell ........ 30 years.
Theodore E. DeMars ..... 15 years.
Francis A. Martin ....... 5 years.
Edmond J. Moran ........ 5 years.

It has been noted that the *Chester* was originally taken out of service in 1939 and that she had not been in operation up until the time it was requisitioned by the Government, but there is no question but what the *Chester* was in good condition at the time of her requisition and that she was a large, well-constructed vessel, possessing at least average earning capacity.

Any attempt to arrive at a fair valuation of the *Chester* based on average annual earnings would necessarily be predicated upon two basic factors which can be arrived at only by estimation. As the *Chester* had never been in actual operation as a lighter in the New York harbor, her anticipated revenues could only be determined in the light of the actual earnings of the other lighters which had been operated over a period of years by the plaintiff. The average earnings of these lighters owned by plaintiff show a profit of $5,472 per year per vessel over the 5-year period 1938-1942, and a profit of $9,766.80 per vessel in 1942. (Findings 11 and 12.) In view of the size, carrying capacity, speed, and condition of the *Chester*, it can be fairly assumed that her average annual earnings would at least equal the annual average of all the lighters operated by plaintiff as most of them did not possess the qualities of the *Chester*. On this basis we would be justified in estimating the average annual earnings of the *Chester* somewhere in the neighborhood of the general average figure of $5,472.

We are then called upon to estimate the number of years of useful remaining life which could be attributed to the *Chester*. From the testimony of the various witnesses we have seen that their estimates on this point vary from 5 to 20-25 years. Upon the basis of this evidence we conclude that the reasonable life expectancy of the *Chester* would be approximately 10 years. By multiplying the prospective average earnings by this figure, the vessel could reasonably have been expected to earn $54,720 before economical considerations would require its retirement from service.

The plaintiff has quite correctly pointed out that the years 1938 to 1942 do not represent a period of prosperous economic conditions, being somewhat below normal as a result of the mild depression which immediately preceded World War II. However, if we consider the years following 1942 we would become involved with the

general enhancement of values of all kinds occasioned by the war. United States v. Cors, 337 U.S. 325, 69 S.Ct. 1086.

A summary of the evidence and the various factors which we should consider in determining the fair value of the *Chester*, which would represent just compensation to the owners at the time and place of taking, includes the following: The vessel was built in 1908 at a cost of $56,000; that at the time of her taking she was approximately 35 years of age, with a life expectancy of 10 years; that the vessel was of better than average construction, and that, by reason of her condition, plus the repairs which had been recently made, she was in good condition at the time of the requisition; further, that while the vessel had been taken out of service by the Delaware, Lackawanna & Western Railroad Company because it had no further use in its particular business, the boat did represent a valuable addition to the fleet of lighter vessels which the plaintiff was operating at that time in its well established business in and about the harbor of New York. The estimated value of the vessel from the standpoint of the witnesses ranges from $10,500, which represents approximately its scrap value, to $75,000. On the basis of average earnings of $5,472 annually over a period of years, a value of $54,720 is found. The plaintiff urges that the value to it of the boat was $68,000, while the Government insists that a proper valuation would be represented by its cost of acquisition plus the repairs, or approximately $35,000.

■ Somewhere within the range of these figures and from the evidence with reference to the age, type of construction, condition and remaining useful life, we must determine an amount which in our opinion represents fair value by way of just compensation for the *Chester* at the time and place of its taking. Without adhering to any of the various formulas which we have carefully reviewed, and "without pretending to any mathematical accuracy which we do not feel", Smith-Douglass Company, Inc. v. United States, Ct.Cl., 1948, 81 F.Supp. 215, 218, we conclude that the value of the *Chester* on February 27, 1943, was $46,245.00, and that

that amount will represent just compensation to the owners for its taking.

Plaintiff is therefore entitled to recover this amount with interest as a part of just compensation at 4 percent per annum on $46,245.00, from February 27, 1943, to the date of payment of this judgment.

It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER and LITTLETON, Judges, concur.