Mayme J. RILEY, Parcel 372, Lot 12, Square 590, Appellant,

v.

DISTRICT OF COLUMBIA REDEVELOPMENT LAND AGENCY, Appellee.

No. 12782.

United States Court of Appeals District of Columbia Circuit.

Reargued Sept. 25, 1956.

Decided April 22, 1957.

---

11. The exact basis of Judge Schweinhaut's decision is not clear from the record.

Mr. John J. Spriggs, Jr., Washington, D. C., for appellant.

Mr. Roger P. Marquis, Atty. Dept. of Justice, for appellee. Mr. S. Billingsley Hill, Atty. Dept. of Justice, also entered an appearance for appellee.

Mr. James C. Wilkes, Washington, D. C., at the request of this Court, filed a brief as *amicus curiae*.

Mr. Marvin J. Sonosky, Washington, D. C., at the request of this Court, filed a brief as *amicus curiae*.

FAHY, Circuit Judge.

The case is before the full Court now on reconsideration of an unreported decision of a division of the Court of May 17, 1956.* In that decision, by a divided Court, a judgment of the District Court for appellant in the sum of $7,-000.00, awarded to her by a jury as compensation for her home, which had been taken in condemnation proceedings by the District of Columbia Redevelopment Land Agency, was set aside. The case was remanded for further proceedings, including a new trial if necessary. A

* Opinion vacated June 5, 1957.

majority of the full Court now reach the same conclusion for the reasons herein stated.

The property had been bought by appellant as a home in 1951. She undertook to pay $9,950.00, of which some $300.00 was paid in cash and $9,655.00 was represented by three notes secured by trusts on the property. The notes called for monthly payments, including principal and interest, of $72.50. Appellant installed a new furnace and gas and did some roofing, guttering and other work at a total cost of $877.00. The home thus represented obligations and expenditures of some $10,800.00. In March, 1955, the jury awarded appellant $7,000.00 as just compensation, that is, as the fair market value of the property. This was $3,800.00 less than she had paid for it, plus the improvements referred to, and would leave her without the property and still owing some $1,-900.00 on the deferred purchase price notes.

▇ The jury was properly instructed that the property at the time of the taking,

"* * * is to be appraised at its fair market value as of June 21, 1954, the date of the taking by the Land Agency, with reference to the most advantageous, highest or best use or uses to which it can be put. By fair market value is meant what the property would sell for in cash or terms equivalent to cash, when offered for sale by one who is willing but is not obliged to sell, to one who desires but is not obliged to buy."

It has long been recognized that the fair market value may be either what the property would sell for in cash or on terms equivalent to cash. Kerr v. South Park Commissioners, 117 U.S. 379, 386–387, 6 S.Ct. 801, 29 L.Ed. 924; Shoemaker v. United States, 147 U.S. 282, 304, 13 S.Ct. 361, 37 L.Ed. 170.[1] These are alternative criteria for establishing the fair market value.

The terms are equivalent to cash if the deferred purchase money notes are such that under normal conditions the notes can be turned into cash at their face amount. Thus, the principal of the notes is not increased by the addition thereto of a charge for credit. The rate of interest earned by the notes and their underlying security are factors to be considered in determining their cash value.

We think in this case the jury should have been given such an explanation of the expression "terms equivalent to cash." The chief evidence as to the fair market value of the house was the 1951 sale to appellant for $9,950.00 on terms, prior to her expenditure of $877.00 for improvements, and the 1954 valuations of the two Agency appraisers, neither of which exceeded $7,000.00. The proper determination of the fair market value of the property, in face of this divergent evidence, required an understanding of what terms are "equivalent to cash." Without it the jury[2] could not reach a reasoned conclusion as to the relationship between the 1951 credit sale to appellant and the fair market value of the property.[3] A credit sale is indica-

---

**1.** In this jurisdiction the phrase "on terms of reasonable credit" has, at times, been substituted for "terms equivalent to cash." District of Columbia Redevelopment Land Agency v. 70 Parcels of Land, D.C., 153 F.Supp. 840; United States v. 177 Parcels of Land, District Court Docket 10–55. We think these to be synonymous.

**2.** Juries in condemnation proceedings, consisting of five members, are selected from a special list of persons whose only statutory qualification, in addition to those

required of jurors in other cases, is that they must be freeholders of the District of Columbia. Sections 16–629, 16–603, D.C.Code (1951). As used here we think the term "freeholder" means only one who owns land in fee or for life or for some indeterminate period.

**3.** The error we have discussed was not preserved for review in accordance with Rules 46 or 51, Fed.R.Civ.P., 28 U.S.C.A. But the subject was among those considered in the present context to be of such importance as to warrant special

tive of the fair market value of the property only to the extent to which the notes can be turned into cash, that is, are "equivalent to cash."

The circumstances of this case made it especially necessary that such an explanation be given. Unjustified doubt was cast on the relation of the 1951 sale to the 1954 fair market value by a factual error of the two Agency appraisers. One of these appraisers testified that in reaching his valuation he gave little weight to the sale to appellant "because the third trust would run at perpetuity * * *. The monthly payment was not enough to pay even the interest on the property." The other appraiser made a similar statement. Yet the contract of sale and appellant's receipt book, both of which are in the record, reveal that the monthly payments of $72.50 covered all interest and were reducing the principal each month. At the time of the trial $752.70 had already been paid on the principal, in addition to the $295.00 down payment. These erroneous statements could not fail to influence the jury toward the view of the Agency appraisers that the 1951 purchase by appellant was at a price grossly in excess of the fair market value of the property.

The erroneous statements weakening the $9,950.00 figure become more serious when considered with the foundation for the much lower valuations of the Agency appraisers. They relied largely upon reproduction costs calculated on a rule of thumb cubic footage basis, less depreciation. The testimony of one appraiser, especially, would have led the jury to believe that this is a formula for arriving at the fair market value. This is not so. While the jury could be informed by the witness of these calculations in explanation of the process by which he arrived at his opinion of fair market value, the calculations were not themselves evidence of fair market value for this type of property. There is no necessary relationship between reproduction cost and market value. Cost of reproduction is a method of valuation usually resorted to "where the character of the property is such as not to be susceptible to the application of the market value doctrine." 4 Nichols, On Eminent Domain, § 12.313 (3rd ed. 1951). There is no indication that this is the case here. Furthermore, the rule of thumb basis for estimating cost of reproduction, used by the Agency appraisers, has been described as being "not even approximately accurate, except for a few highly standardized types of structures." 2 Orgel, Valuation Under Eminent Domain § 193 (1953).[4] There is no showing that this was such a standardized structure. Accordingly, if such testimony is repeated on a new trial the jury should be cautioned that it is before them only in explanation of the process by which the witness arrives at his opinion of fair market value, not as independent evidence of such value, and, further, that the cubic foot cost method of computing reproduction cost is not entitled to great weight in such a case as this even in arriving at reproduction cost.

The wide divergence between the recent credit sale of the house and the evaluations of the Agency appraisers, plus the serious factual error made by the appraisers, and the uncertain method used by them in making their evaluations, made it necessary that the jury be instructed as to the meaning of a sale on terms equivalent to cash, so as to be able to relate the 1951 sale to fair market value. Such an instruction is not required in every case. There have been innumerable condemnation proceedings throughout the country, including now

consideration by Court appointed amici as well as counsel for the parties in connection with the rehearing *en banc*. We therefore notice the error in our discretion to do so. Shokuwan Shimabukuro v. Higeyoshi Nagayama, 78 U.S.App.D.C. 271, 140 F.2d 13; Montgomery v. Virginia Stage Lines, 89 U.S.App.D.C. 213, 191 F.2d 770.

4. Cf. In re United States Commission, etc., 54 App.D.C. 129, 295 F. 950; Wilson Line v. United States, 78 F.Supp. 821, 825, 111 Ct.Cl. 764.

the cases affecting other parcels of land which were tried with this one in our District Court, which we do not draw in question. Those cases are not before us for decision. We have pointed out the special circumstances which lead us to hold that the failure to explain the meaning of "terms equivalent to cash" impairs this particular judgment. We shall set it aside and remand the case for further proceedings not inconsistent with this decision, which may include a new trial.[5]

It is so ordered.

## WASHINGTON, Circuit Judge (concurring).

A majority of the court has decided to set aside the judgment in this case on the ground that the jury was not adequately instructed as to how they should use the evidence of a recent credit sale of the property in arriving at their determination of the property's fair market value in cash. I concur in the court's opinion,[1] on the understanding that what the court wishes a condemnation jury to be told in this regard is substantially along the following lines: The standard to be applied is fair market value. This standard can be represented by cash or terms *equivalent* to cash. When notes are given as part of the purchase price in a credit sale, their discounted or estimated value in cash may be deemed equivalent to cash. The way in which the jury should decide what cash value the notes have must depend on what evidence of value is in the record. Thus, if the evidence includes only the terms of the notes, then the jury should consider those terms, including the amount of the down payment and the interest rates,

along with all known factors relevant to the sale, in deciding in the light of their own familiarity with prevailing credit conditions in the community, for how much real value the property was actually sold. If there is evidence as to what the notes could in fact be discounted for, then the jury should of course consider such evidence. The total received by the seller in a credit sale—namely, the discount price of the notes plus any down payment—is, of course, not a conclusive indication of the value of the property, but is simply one factor to be considered along with all the other evidence.

I am authorized to say that Chief Judge EDGERTON and Circuit Judge BAZELON join in the foregoing analysis.

## BURGER, Circuit Judge, dissenting, with whom BASTIAN, Circuit Judge, concurs.

The judgment of the District Court is reversible in this case only (1) if evidence was erroneously admitted or rejected and the error preserved; (2) if instructions were erroneously given or refused and the error preserved; or (3) if either of the above errors occurred and, while not preserved, "it is apparent to the appellate court on the face of the record that a miscarriage of justice may occur * * *." Shokuwan Shimabukuro v. Higeyoshi Nagayama, 1944, 78 U.S.App.D.C. 271, 273, 140 F.2d 13, 15.

An earlier opinion of a panel of this court[1] reversed the District Court's judgment by a two-to-one vote on the general ground that appellant's "pertinent and direct evidence of value," namely the credit sale to her in 1951, "was not dispelled and no contrary evidence

5. We find no inconsistency between the views expressed in Circuit Judge Washington's concurring opinion and those herein set forth.

1. When this case was previously heard by a panel of the court, I voted to affirm. Since a majority of the full court, after consideration *en banc*, has now concluded that a reversal is appropriate in the in-

terests of justice and good judicial administration, and since no change in the substantive law of eminent domain is being effected, I am willing to join the majority's effort to clarify a portion of the charge to the jury.

1. Riley v. District of Columbia Redevelopment Land Agency, No. 12782, May 17, 1956, (Washington, J., dissenting).

was satisfactorily presented."[2] The present majority opinions reach the same result, namely a remand and presumably a new trial, but on different grounds and for different reasons. I dissent because the opinion of Judge Fahy, fairly read, does not disclose errors within points (1) or (2) above, and the record shows nothing to warrant our holding that a miscarriage of justice has occurred.

That opinion reaches a conclusion which both as to result and reason is plainly against the overwhelming weight of authority and would require by way of instructions more than called for in any condemnation case previously decided in this country. In so doing, that opinion ignores the warning that "hard cases make bad law." Mrs. Riley's situation presents one of those "hard cases."

Judge Fahy's opinion sets forth the charge which was given and a glance shows it is the conventional, traditional and correct charge which has been approved over the years. If it is not fair of course it should be changed. Whenever existing rules of law cannot meet newly developed conditions affecting important rights of substantial numbers we should not be fearful of a new solution merely because it is new. But that is not the case here; no new or unusual situation not previously considered by the courts is shown to exist. Indeed, the present opinions admit the jury "was properly instructed."

Long ago the essence of the correct charge given in this case by the trial judge was laid down. It was restated by the Supreme Court in Olson v. United States, 1934, 292 U.S. 246, 254–255, 54 S.Ct. 704, 708, 78 L.Ed. 1236, which is perhaps the most cited case on this subject in our law.

Quoting from another landmark case[3] the Court in the Olson case said: " 'In any society the fullness and sufficiency of the securities which surround the individual in the use and enjoyment of his property constitute one of the most certain tests of the character and value of the government.' " Continuing, the Court said: "The statement in that opinion [148 U.S. at page 326, 13 S.Ct. at page 626] that 'no private property shall be appropriated to public uses unless a full and exact equivalent for it be returned to the owner' aptly expresses the scope of the constitutional safeguard again the uncompensated taking or use of private property for public purposes. * * *

"That equivalent is the market value of the property at the time of the taking contemporaneously paid in money. * * * *It may be more or less than the owner's investment.* He may have acquired the property for less than its worth or he may have paid a speculative and exorbitant price. Its value may have changed substantially while held by him. * * * *The public may not by any means confiscate the benefits, or be required to bear the burden, of the owner's bargain.*" (Emphasis added.)

One might select almost at random any volume of appellate court reports, state or federal, and in moments find this rule of law applied in the same or similar terms.

Judge Fahy's opinion states:

"It has long been recognized that the fair market value may be either what the property would sell for in cash or on terms equivalent to cash. Kerr v. South Park Commissioners, 117 U.S. 379, 386–387, 6 S.Ct. 801, 29 L.Ed. 924; Shoemaker v. United States, 147 U.S. 282, 304, 13 S.Ct. 361, 37 L.Ed. 170. These are alternative criteria for establishing the fair market value." (Footnote omitted.)

This is a correct statement and it is the law which was admittedly given to the jury. It makes plain the basic rule that the terms "cash" and "terms equivalent to cash" represent an equation or dif-

---

2. Riley v. District of Columbia Redevelopment Land Agency, supra note 1 at 13, 15.

3. Monongahela Navigation Co. v. United States, 1893, 148 U.S. 312, 324, 326, 13 S.Ct. 622, 37 L.Ed. 463.

ferent forms, of *the same* value, as a measure of payment.

The opinion continues:

> "The terms are equivalent to cash if the deferred purchase money notes are such that under normal conditions the notes can be turned into cash at their face amount. \* \* \*
>
> "\* \* \* A credit sale is indicative of the fair market value of the property only to the extent to which the notes can be turned into cash, that is, are 'equivalent to cash.'"

These two sentences seem contradictory and inconsistent to me and are more likely to confuse than to aid a jury in understanding what is essentially a simple problem.

It is because the problem is simple that the basic charge which has long been approved should not be tampered with. Judge Washington's restrictive interpretation of what should be given by way of explanation is less likely to cause confusion but neither explanation is necessary.[4]

The several proposals for additional instructions start from the premise that the jury needed some explanation of the phrase "terms equivalent to cash." I would agree that a jury is entitled to know the meaning of terms used in a charge but I question that any new explanation is called for now any more than it has been in the past. It would never occur to me that a definition of this phrase was required for any jury, and least of all in a condemnation case where jurors are so-called "blue-ribbon" jurors, selected only from freeholders. This case was tried with the cases of a number of other landowners and involved over 40 parcels of land in all. The same jury heard all evidence in all the cases. Fourteen lawyers sat in the courtroom representing the various claimants *and not one of them thought to raise the point now regarded as crucial.*

No member of the court contends the trial judge misled or confused the jury by the instruction; nor does either of the above opinions support the assumption that the jury was in need of the explanation. The assumption that an explanation is needed is a naked assertion of a conclusion that "Without [the explanation] the jury could not reach a reasoned conclusion as to the relationship between the 1951 credit sale to appellant and the fair market value of the property." None of the fourteen lawyers representing the landowners involved in these proceedings thought it necessary to suggest that the jury required this definition. On the contrary, everyone at the trial accepted the fact that the jury had an awareness of the mechanics of discounting a secured note and was thus able to relate a credit sale to the fair market value of the property. Indeed that assumption was amply warranted. The record shows numerous statements made by counsel, expert witnesses and the trial judge, in the presence of the jury, to the effect that the jury would have to estimate the discount value of deferred payment notes in using evidence of credit sales to arrive at a fair market value. Plainly one of the major, if not controlling, factors in this appraisal would be what the notes could be liquidated for against the security. Furthermore the court, against this background discussion of the relationship between credit transactions and cash value, repeated to the jury in the instruction this additional reminder:

> "Recent bona fide sales under fair market conditions, and under like conditions, of the parcel to be condemned, or in the vicinity thereof, or so situated as to have a bearing upon the market value of the land to be condemned in these proceedings, may be considered by the jury *insofar as such sales, looking at the circumstances of each instance, may*

---

4. While we are firm in the view that no added explanation or definition of "terms equivalent to cash" is needed, we agree that in cases where the trial judge considers it desirable or necessary to do so that Judge Washington's explanation is adequate.

*reasonably be regarded as evidencing or throwing light upon the fair market value of the land to be condemned * * *.*" (Emphasis added.)

And yet Judge Fahy's opinion seems to say that this specially selected jury could not understand what was meant by the charge on determining fair market value in "cash or terms equivalent to cash" without definition. This is to suggest that for many, many years all the courts in this country have been in error on this score, notwithstanding the disclaimer that the proposed explanation need not be given in every case.

A purchase on "terms equivalent to cash" has always meant and means today terms of deferred payments, the aggregate of which (exclusive of interest) is the same price at which the property can be purchased for all cash.[5] Economic conditions of the country generally and of the real estate market particularly are of course not rigid. Today such deferred terms may require at least 40% cash down to keep the price "equivalent to cash"; a year or two from now it might be down to 35% or up to 45%. When a purchaser is lacking cash and cannot meet the prevailing "down payment" requirements of the market, he must bear the burden of a premium for longer credit terms in the form of a higher price. But this is not the *market* price; it is the market price *plus* the premium he must pay the seller or other lender for his lack of cash and the consequent need for long credit. This is not the *market price*, it is *his* price in his particular and peculiar circumstances.[6]

To suggest that there is something inherently unfair in this, (and I am not

clear that a majority expressly goes that far) is to quarrel with the facts of life. A mail carrier, a government lawyer, or a night watchman, who is thrifty and careful enough to accumulate a reserve of cash can go down to a cash appliance store and buy for $199 cash a refrigerator which his less thrifty fellow-worker may only buy for $279 plus whatever interest and finance charges are involved in a two or three year installment purchase of the same merchandise.

The giving of the newly proposed "explanation," which at best is vague and general in terms, is not essential in a condemnation case and failure to have given it is not reversible error by any known standard.

I next come to what seems to be one of the important grounds obliquely relied upon as a ground for reversal in an effort to strengthen obviously weak grounds for remand. This ground is simply a criticism of the *testimony* of the experts called by the Government because they cast "[u]njustified doubt" on the evidence of appellant. "These erroneous statements," the opinion argues, "could not fail to influence the jury toward the view of the Agency [government] appraisers that the 1951 purchase by appellant was at a price grossly in excess of the fair market value of the property." Of course that was the *tendency* of the Agency's evidence, just as Mrs. Riley's evidence was intended and directed toward the view that the government experts were low in their figures. But the very essence and purpose of an adversary proceeding is to do just what each litigant did here and it had never occurred to me that errors *in the testimony* constitute grounds for reversal.[7]

5. Judge Washington's concurring opinion states this long accepted and basic proposition but in another way.

6. In its en banc consideration of this case some members of the court called for briefs from amici curiae, as well as from the litigants, on whether there are not *two* fair market values of a house, one its value in *cash* and another its value on deferred payments, *i. e., credit*. This

dissent assumes that no member of the court now intends to suggest that there are *two* values for a parcel of real estate.

7. As Judge Washington so cogently pointed out in his dissent to the original panel opinion:

"It is suggested that the experts erred in their testimony as to whether appellant's payments were reducing the amount

The adverse party, not the appellate courts, must bear the burden of showing that the expert for one litigant has been inaccurate, or has exaggerated or even that he testified falsely. It is indeed novel to imply that it is reversible error for expert witnesses in an adversary civil proceeding to give testimony which influences the jury in one direction!

As the Supreme Court said in Roberts v. New York City, 1935, 295 U.S. 264, 277–278, 55 S.Ct. 689, 691–692, 79 L.Ed. 1429:

"In condemnation proceedings as in lawsuits generally the Fourteenth Amendment is not a guaranty that a trial shall be devoid of error. * * * To bring about a taking without due process of law by force of such a judgment, *the error must be gross and obvious*, coming close to the boundary of arbitrary action. The test has been differently phrased by different judges and in different contexts. At times we find * * * there has been 'absolute disregard' of the right of the owner to be paid for what is taken. * * * At other times we are told that due process is not lacking unless 'plain rights' have been ignored, with a reminder that much will be overlooked when there is nothing of unfairness or partiality in the course of the proceedings. * * * Enough for present purposes that when the hearing has been full and candid, there must ordinarily be a showing of something more far-reaching *than one of dubious mistake in the appraisal of the evidence.* Due process is a growth too sturdy to succumb to the infection of the least ingredient of error." (Emphasis added.)

This case is a reversal without an appellate holding that any error occurred in the trial. It is a manifestation of the unspoken doctrine of the second chance, by which this court, in a case which arouses sympathy, gives a litigant another trial. Where we see an obvious miscarriage of justice this would be warranted, but not when, as here, there is neither error nor injustice.

---

owed on her trust notes on the property. This may be, but it provides no basis for a new trial; appellant presented ample evidence to rebut their testimony, and it is not suggested that there is anything new on this point to be introduced at a new trial." Riley v. District of Columbia Redevelopment Land Agency, *supra* note 1 at 19.