Howell, Judge,
delivered the opinion of the court:
This proceeding involves the value of the motor vessel La Paz along with her equipment and furnishings on October 14,1942.
On that date the War Shipping Administration requisitioned the vessel pursuant to Sec. 902 of the Merchant Marine Act of 1936, as amended (53 Stat. 1255) and Executive Order 9054 (7 Fed. Reg. 837), and took possession thereof together with the equipment and furnishings. The defendant has neither paid nor tendered any amount whatsoever as compensation, for the vessel,
*122 There is no dispute as to the Government’s liability for just compensation, only the amount thereof, being in controversy.
The plaintiff asserts that the value of the vessel requisi-. tioned was at the time of taking $1,500,000.00 and, accordingly, it sues for that amount plus interest at the rate of four per cent per annum from the date of taking.
The La Paz on and prior to May 1, 1942, was of British registry and was owned and operated by the Pacific Steam Navigation Company. She was a steel motor cargo vessel built by Harlan & Wolff Shipyards at Glasgow, Scotland, in October 1920, for the owner. She was a twin-screw Diesel-propelled vessel, having a net tonnage of 4,052.42, a gross tonnage of 6,547.85, and a dead weight tonnage of 9,191 tons. Her length was 406' 3", beam 54' 2", and depth. 32' 9". Her bale cargo cubic capacity was 462,399. She had two steel decks and a steel shelter deck, five holds and five hatches, with 15 all-steel cargo compartments, and seven bulkheads to shelter deck. Her bunker capacity was 839 tons, and her speed about 11 knots per hour. She was powered by two Burmeister & Waine Diesel engines of 810 nominal horsepower each according tot Lloyd’s formula, which according to plaintiff is equivalent to 3,600 horsepower for the two engines and according to defendant is an indicated horsepower of 3,200 and a brake horsepower of 2,400. The ship was constructed with the idea of giving-as much cubic cargo space per deadweight ton as possible and was designed so as to be able to load or discharge at 13 or 14 ports. At the time of the explosion, damage hereinafter referred to, she was classified 100 a-1 Maltese Cross by Lloyd’s, which is the highest classification.[1]
The ship had been torpedoed by enemy action on May 1, 1942, and beached near Cape Canaveral, Florida. On July 9, Í942, plaintiff purchased the vessel for $10,000.00 at a marshal’s sale as the result of a libel for salvage filed against it. Plaintiff procured provisional Honduran registry for the La Pas in Jacksonville, Florida, on July 13, 1942, while she was lying on the beach in damaged condition; but final *123 registration was never consummated, and at the time of requisition sbe was unregistered and undocumented. Plaintiff raised the vessel at an outlay of $237,753.59 in addition to the purchase price of $10,000.00.
After various credits and the exclusion of overhead and other items, the net amount as stipulated between the parties, was $100,331.17.
Plaintiff undertook the work of raising the vessel on its own account and hired divers and started the salvage operation. The vessel was approximately two miles offshore with her stern lodged on the bottom in about fifty feet of water.The explosion caused by enemy action blew away the stern, i. e., the after part of No. 5 hold, but there was no explosion damage forward of the bulkhead between Nos. 4 and 5 holds, and there were no holes to the sea except in the after end of No. 5 hold. As a result of this damage No. 4 hold and the engine room were filled with water and at high tide water would break over the hatches of No. 3 hold, located just forward of the engine room, so that No. 3 hold was partly submerged. Nos. 1 and 2 holds were at all times afloat and dry and only the extreme after end of the vessel touched bottom, which consisted of soft mud. The explosion occurred at the point where the propellers were and blew away the after end of the vessel, including the rudder, propellers, and stem to a distance of approximately 30 feet, fore and aft, and 28 to 30. feet vertically.
Plaintiff commenced salvage operations the latter part of May; pumping was started June 1, 1942, and within two weeks from that time the engine room was pumped dry. As soon as the engines came out of the water oil was poured into and over them and they were turned over by hand so-as to distribute the oil throughout the cylinders. Shortly thereafter a fire occurred in the engine room which resulted in the failure of the pumps, and the vessel was submerged again for a period of from two to three days.
The Leu Paz was finally floated the latter part of Sep-, tember 1942, and towed into Jacksonville under her own bouyancy, a distance of approximately 175 miles. Towing-charges of $7,000.00 for the use of the Navy tug have not been paid. This charge plus the net sum of $100,331.17-: *124 plaintiff expended in salvaging the vessel represents the “out of pocket expenses” of plaintiff.
During the salvage operations plaintiff had employed one L. Louis Green, Jr., a Naval architect, Vice President and General Manager of the Charleston Shipbuilding and Dry Dock Company at Charleston, South Carolina, and Vice President of the Southeastern Shipbuilding Corporation at Savannah. According to the testimony, Mr. Green went aboard the vessel at Cape Canaveral before the salvage operation began and made weekly visits and received daily reports as to the progress of the salvage operations. Plaintiff, through its agent Mr. Lovett, discussed with Mr. Green the question of repairing the vessel and as a result of his estimates made in the course of the salvage operations, but before the ship had ever been drydocked, Mr. Green, on behalf of Charleston Shipbuilding and Dry Dock Company, submitted a bid of $890,000.00 to return the ship to the condition she was in prior to the sinking and bring her back to class.
The La Pas was requisitioned for title by defendant on October 14, 1942, at Jacksonville, Florida, while the vessel was in a damaged condition. After the requisitioning the defendant had the ship repaired and altered at the Merrill-Stevens Dry Dock and Eepair Company in Jacksonville' under a cost-plus contract at a total cost of $1,416,189.39. Admittedly included in this amount were items for bringing the vessel up to American standards, for installation of defense equipment, and for various betterments deemed desirable by War Shipping Administration.
The initial estimate prepared by M. V. McFarland, Principal Marine Surveyor, and John K. Lindgren, Senior Marine Surveyor of War Shipping Administration, of the cost of repairs was $720,000.00. Some of the work on the La Paz involved overtime, as it was carried on in two 10-hour shifts and on Saturdays and Sundays. There was- no breakdown in the final invoice rendered for repairs between straight time and overtime,' and War Shipping Administration has no record of the amount of overtime. A substantial amount of the cost of these repairs was recaptured, but defendant produced no testimony as to the amount.
*125 As we said, plaintiff sues to recover $1,500,000.00 as just compensation, whereas the defendant contends that the vessel had a value only as scrap, the reasonable value of which at the time of taking was $65,000.00.
Obviously we are confronted with unusual difficulties in the determination of the amount of just compensation due the plaintiff. Both plaintiff and defendant presented substantial evidence concerning those factors ordinarily entering into the determination of just compensation. Wilson Lines, Inc. v. The United States, 111 C. Cls. 764; The Toronto, Hamilton and Buffalo Navigation Company v. The United States, 112 C. Cls. 240.
We will review this evidence briefly. Estimates of the theoretical value of the La Paz as an operating vessel in sound condition varied from $551,000.00 to $2,000,000.00. The reproduction value of the vessel was established between $2,000,000.00 and in excess of $2,500,000.00. The remaining useful life of the vessel as well as the proper rate of depreciation varied widely, ranging from 20 to 50 years with the rate of depreciation from two and one-half percent progressive to five percent on a diminishing balance.
The earning capacity of the vessel, under Maritime Commission rates was fixed at $140,000.00 per year on a bare-boat charter basis, and after the wartime restrictions were removed in June 1946, the ship could have been chartered on a time charter at $3.00 per ton bareboat. Plaintiff’s agent testified the vessel could have been profitably utilized in the operations of the shipping company and that he could have made $1,000,000.00 profit during the years 1943 to 1945, inclusive, and possibly in 1946.
After the La Paz was brought to Jacksonville, plaintiff obtained port risk insurance on the vessel in her then damaged condition in the amount of $500,000.00.
Plaintiff also introduced testimony bearing upon the value . of the La Paz in the condition in which she was requisitioned, i. e., the value of the hull and machinery. The value of the hull was fixed at $680,000.00 and the machinery in its damaged condition at $125,000.00 to $150,000.00, based upon a. replacement value of $325,000.00 to $350,000.00. Each of defendant’s witnesses fixed the value of the vessel *126 considerably below tbe cost of repairs, hence defendant contends that the only value it had was as scrap, worth $10.00 per ton which was the going rate at the time of requisition, or $65,000.00. We do not believe this figure represents a fair measure of just compensation to the plaintiff.
Plaintiff has argued at considerable length the proposition that since it did not have the advantage of the wartime conditions and the circumstances existing at the time the vessel was requisitioned in valuing the vessel in operating condition that it would be unfair to charge plaintiff with the full amount of the cost of repairs, especially where plaintiff was not in a position of a wrongdoer but in the position of one analagous to that of a willing seller.
With this contention we find ourselves in agreement.[2] Unquestionably, the amount of money expended in repairing the La Paz reflected the inflated wartime prices. The testimony reveals that these repairs were accomplished in a most expensive manner. The ordinary costs of wartime labor and materials were further compounded by the use of overtime in that the work was carried on in two' 10-hour shifts and on Saturdays and Sundays. No evidence was offered concerning the exact amount of repairs made during straight time and overtime in view of the fact that the War Shipping Administration has no record of the amount of overtime. Furthermore, a certain amount of the cost of these repairs was recaptured, but the defendant failed to produce any testimony as to the amount.
*127 . Tbe record also discloses that the defendant brought the vessel to a state of repair far beyond that which would have been necessary from the standpoint of a private owner. Our Finding 12 describes these repairs in detail.
What we have said with reference to the record concerning the overtime labor expenses and the unnecessary or elaborate repairs is sufficient in our opinion to justify the ■conclusion that the amount spent was considerably in excess of the amount' which a private owner would have been required to spend in order to bring the ship back to class. However, we must content ourselves with this general observation for the reason that it would be utterly impossible to segregate the amounts with any reasonable degree of certainty.
• The record does show that plaintiff’s witness, Mr. Green, .testified to a firm bid of $390,000.00 to return the ship to the condition it was in prior to the sinking. Also, that a surveyor for Lloyd’s declined to make an estimate as to. the cost of necessary repairs for the principal reason that it would not be possible “to offer any intelligent estimate of the costs connected with the repairs to the Hull and Machinery as long as the vessel cannot be examined on Drydock and the full estimate of the damage established.” We also know that the War Shipping Administration’s surveyor estimated the cost of repairs at $720,000.00.. Finally, we know that the vessel was repaired by the defendant at a total cost of $1,416,189.39, of which amount $170,615.08 was attributable to ordinary maintenance, $1,069,208.70 to repairing damage due to enemy action, and $173,547.48. to defensing the vessel and installing betterments. The sum of the first two items, or $1,239,823.95, represented the cost to defendant of putting the ship in sound condition as an operating vessel from its standpoint. We have found this amount to be unreasonable under the circumstances (Finding 13).
Plaintiff had been in the shipping business since 1939, engaged in trading between Jacksonville, Baltimore, Mobile, and the West Indies. In view- of the scarcity of ships and the resultant demand for cargo carrying capacity in 1942, *128 plaintiff expected to have the La Paz repaired and' placed in service in a short time with offers of cargo open for acceptance. In other words, the plaintiff acquired the vessel for the purpose of operating it as a ship. Conversely, the defendant was desperately in need of cargo vessels of every type and acquired the La Paz for the purpose of repairing and operating it as a ship. Under these circumstances we cannot say that the defendant requisitioned the vessel for scrap (Broadfoot v. United States, 113 C. Cls. 280). Both parties had an owner’s interest in the vessel and not a junkman’s. In 1929 A. M. C. 1372, in connection with a petition for limiting liability for the loss of the tanker Agwisim to the breakup value of $75,000.00, the Commissioner reported:
For salvaging the machinery and scrapping the hull, the Agwisim was worth $75,000.00, but was this the only use to which the wreck could be turned? It was for the very different purpose of reconstruction that the wreck was raised. * * * It is the petitioners’ interest that is to be valued. It was a ship owner’s interest and not a junk man’s. If I am to view the subject not retrospectively from the time of hearing but prospectively from the date of the disaster, so also did those who had the ship raised for reconstruction. In following them, I am not substituting judicial judgment based on after inference for expert judgment acted on at the time. Their prudent foresight was justified. They were practical men and the Admiralty is a very practical branch of law. Orion, 239 Fed. 301-303.
We therefore, reach the conclusion that the defendant requisitioned the La Paz as a ship and not as scrap steel. In other words, the defendant requisitioned a ship with a hole in it and not a hole surrounded by scrap steel.
From a consideration of all the evidence, including the exhibits, we find that the net value of this vessel, having in mind its worth as a ship in damaged condition and the reasonable cost of repairs, at the time and place of its taking was $125,000.00. Pontin Boat Corporation v. United States, 116 C. Cls. 488.
To this sum must be added the reasonable value of the following property taken by defendant in connection with the requisition of the La Paz which has not been paid for:
*129 Salvage equipment_$16,000. 00
Consumable stores- 2,050. 31
From this sum shall be deducted the amount of $7,000.00 for charges in towing the vessel to Jacksonville, which sum has not been paid by- plaintiff,.and plaintiff may have judgment for the remainder or $136,050.31.
Plaintiff is also entitled to receive compensation measured by interest at the rate of four per cent per annum for delay in payment on the sum of $136,050.31 from October 14,1942, to date of payment.
It is so ordered.
Madden, Judge; Whitaker, Judge; Littleton, Judge; and Jones, Chief Judge, concur.

 The expression “return to class” refers to this classification when used' herein.

 See Document No. 20, Compilation of Material on the Determination of Material on the Determination and Payment of Jugt Compensation for vessels requisitioned under Section 902 of the Merchant Marine Act of 1936. At page 124 there is a ruling by the Comptroller General of the united States in response to certain questions propounded by the Administrator of the War Shipping Administration as to the treatment to be accorded vessels which have been reconstructed or extensively repaired after the theoretical date as of which the valuations were to be fixed, wherein it is said: “In such"cases the value of the vessel has been enhanced by reason of the improvements or repairs effected thereon by the owner. Judged by standards existing as of September 8, 1939, the value of the work done may not equal the actual cost thereof just as in the case of the construction of an entire vessel. The variance represents, of course, the inflated cost of labor and materials which, in turn, is caused by the emergency. However, in view of the obvious hardships that would result were the limitation to be applied in such cases, it may be concluded that the Congress did not intend to limit the compensation insofar as such indirect elements of the value of a yessel are concerned.”