## In re UNITED STATES COMMISSION TO APPRAISE WASHINGTON MARKET CO. PROPERTY.

(Court of Appeals of District of Columbia. Submitted December 3, 1923. Decided February 5, 1924.)

No. 685.

1. **Eminent domain ⬡149—Award based on fair valuation.**

In an eminent domain proceeding under Act March 4, 1921, to appropriate all the buildings and improvements owned by the Washington Market Company, a corporation incorporated under Act May 20, 1870, with a view of continuing the business, evidence of the cost of reproduction and depreciation *held* to show the fair and just valuation of this property was $1,522,197.88.

2. **Eminent domain ⬡202(1, 6)—Error to consider assessment for taxation, etc., in determining valuation.**

In determining the fair valuation of property, *held*, that it was error to consider the amount of insurance carried by the corporation owning the property, its valuation for taxation purposes, and the value of owner's capital stock.

3. **Eminent domain ⬡130—Cost of reproduction, less depreciation, held fair value of property.**

The only just and legal method of arriving at the fair value of property taken *held* to be the cost of reproduction, based on present values, with deductions for the amount of depreciation.

4. **Eminent domain ⬡93—Commission to fix valuation cannot allow for going concern value.**

In an eminent domain preceeding under Act March 4, 1921, to appropriate buildings and improvements owned by the Washington Market Company, the commission appointed to appraise and fix the value of the property *held*, under sections 3 and 4, to have no power to allow for going concern value.

5. **Eminent domain ⬡238(6)—Court of Appeals reviews action of commission only within limitations imposed on commission.**

In reviewing the findings of a commission appointed to appraise and fix the value of property taken for public use under Act March 4, 1921, the Court of Appeals has jurisdiction only to review the action of the commission within the limitations imposed on the commission by Congress.

Appeal from Award of Commission Appointed to Appraise and Fix the Valuation of Property Belonging to the Washington Market Company.

In the matter of the United States Commission to appraise Washington Market Company property. From an award of the commission, fixing the valuation of the property, the Washington Market Company appeals. Award revised, and amount fixed at a stated amount.

Alexander Wolf and C. A. Douglas, both of Washington, D. C., for Washington Market Company.

Le Roy L. Hight, of Portland, Me., for the United States.

Before ROBB and VAN ORSDEL, Associate Justices, and BARBER, Judge of the United States Court of Customs Appeals.

⬡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

VAN ORSDEL, Associate Justice. This appeal is from an award of a commission appointed to appraise and fix the valuation of the buildings and improvements belonging to the Washington Market Company.

[1] Reservation No. 7, where the market under consideration is now situated, was set aside as a market site on the plan of the original city as approved by Gen. Washington. In October, 1802, the city council passed an act establishing a market thereon, and from that time to the present the site has been used for market purposes.

By Act of Congress of May 20, 1870 (16 Stat. 124), the Washington Market Company was incorporated, with authority to construct buildings and make improvements for the conduct of a market on the site so reserved. The capital stock of the corporation was fixed at $1,000,000, with the further provision that, when not less than 50 per cent. of the stock had been subscribed upon the books of the company, the company would be authorized to organize by the election of officers.

The act provided for the purchase, condemnation, or removal by the company of the buildings and fixtures situated on the land. The company was required, within 60 days after securing quiet and peaceful possession of the real estate to commence work thereon, and to complete the erection of the market buildings within a period of not more than 2 years. It was further provided that the privileges conferred should be enjoyed by the company for a term of 99 years, unless sooner terminated by forfeiture for failure to comply with the terms of the act. It was, however, provided that if the corporation of the city of Washington, after a period of 30 years from the approval of the act, should desire to take over the market buildings and grounds, authority to do so might be conferred by act of Congress, providing that the corporation should be paid "a sum of money equal to a fair and just valuation of the buildings and improvements then standing on said grounds, and the mode and manner of ascertaining such valuation shall be determined by Congress."

The corporation was required to pay to the city of Washington the sum of $25,000 annually, to be set apart and expended by the city government for the support and relief of the poor.

Attached to the act and made a part thereof were explicit specifications as to materials and workmanship required in the construction of the buildings. The foundations were to consist of blue stone masonry laid in cement mortar, erected upon solid natural ground or piled foundations as the conditions might require. The superstructure was to be erected according to a costly and elaborate plan; "all principal partitions of entrance story to be constructed of brick work; the fronts of the stores to consist mainly of French plate glass of first quality, set in hardwood finish." The wood and iron work, as well as the plumbing, painting, and roofing, were all specified to be constructed of expensive materials and in an elaborate style. The first story was to be arranged for a large and open market hall, prepared to receive convenient large-sized and tasty modern market stalls not less than 20 feet high. Indeed, the specifications, as set forth in

the original act, required the construction of the buildings on a most elaborate and expensive scale.

No forfeiture for failure to comply with the terms of the act has ever been attempted to be enforced against the Market Company, nor did the corporation of Washington attempt at any time to exercise the right conferred upon it of condemning and taking over the property after 30 years from the approval of the act.

It appears that the present market was erected at a total cost of approximately $1,060,000. The erection of the permanent buildings was begun early in 1871, and the main portion of the market establishment was completed in the summer of 1872, being opened for business on July 1st of that year. Various modifications, extensions, and installments of machinery, including a large cold storage plant, followed the erection of the original buildings extending down to about 1920, or, as concisely summarized in the report of the minority commissioner:

"The original main building of one-story construction on Seventh, B, and Ninth streets was erected about the year 1873. A one-story construction of Wholesale Row, on the north side, was erected about 1878, and at the same time the newer and ornamental fronts of Seventh and Ninth street wings were put up, consisting of additional walls about 3 feet from the old plain faced walls. Beginning about 1887 the cold storage plant was installed, including the refrigeration building, and from that time on up to within the last year or two numerous additions have been made, including the second story of the B street wing as part of the development of the cold storage. The upper part of the Ninth street wing was an improvement of 1888 or 1889; the second and third floors of the Wholesale Row and upper part of the Seventh street wing were improvements of about 1898 or 1899; the ice tank building and its equipment were an improvement of 1903–04; the rear addition to Wholesale Row was an improvement of 1915 or 1916."

The area used for market purposes, exclusive of courts and driveways, is about 2¼ acres. The market contains about 1,000 stalls and spaces for retail dealers, with cold storage rooms containing approximately 400,000 cubic feet, and refrigerated by 10 miles of heavy 2-inch iron brine piping.

By the Act of Congress of March 4, 1921 (41 Stat. 1441), entitled "An act to repeal and annul certain parts of the charter and lease granted and made to the Washington Market Company by act of Congress entitled 'An act to incorporate the Washington Market Company,' approved May 20, 1870," Congress declared it to be the "purpose and intent of the United States to annul and hold for naught the lease made by Congress to the Washington Market Company, of reservation numbered seven, in the District of Columbia, and to take over unto its own ownership, use, occupancy, and control the said grounds and buildings and improvements thereon and therein now held and occupied by the said Market Company and its tenants."

By the act appropriation was made for the payment of the amount awarded the Market Company, and provision was made for the vesting of the possession and control of the grounds, buildings, and improvements in the Secretary of Agriculture for the benefit of the United States, to be rented by the Secretary, and the business continued as a market under rules and regulations to be promulgated by the

Secretary of Agriculture. The Secretary is empowered to lease the stalls and spaces in said market and to employ persons and purchase such materials as may be essential to the proper operation and maintenance of the property.

Coming to the provisions of the act directly concerned, provision was made for the appointment by the President of the United States of a commission to be composed of "three disinterested men, not more than one of whom shall be a resident of the District of Columbia, to appraise the said buildings and improvements thereon and therein, which were erected or made at the expense of the Washington Market Company, and which stand and remain upon said reservation; the valuation thereof to be determined as of the date of filing said award; and the finding of a majority of said commission shall constitute the award." In case of a dissent by a member of the commission, it was provided that a minority report in writing should be filed and made part of the record. The commission was empowered to conduct hearings at which both the government and the Market House Company might be represented with witnesses, books, and papers, for the purpose of giving each party "a full hearing on the question of what is a fair and just valuation of the buildings and improvements erected and made at the expense of the said market company on said premises, and remaining thereon when the award is made."

The commission is then required to file the award, together with the record and evidence on which it is based, in the office of the clerk of the Court of Appeals of the District of Columbia. It is then provided that, if either party is dissatisfied with the award, appeal may be taken to the Court of Appeals of the District of Columbia, "which court is hereby vested with jurisdiction to hear and determine such appeal, and may revise the amount of the award as shall be just; and the judgment rendered by said court shall be final." It will be observed that the jurisdiction conferred upon the court is coextensive with that of the commission, excepting that the court is limited in its investigation to the record before it. Inasmuch, however, as the record filed in this court is complete as to all the evidence taken and transactions had before the board, the basis upon which an award may justly be determined is the same in both tribunals.

The majority of the commission made a total award of $960,250, while the minority member found the fair and just value of the property to be $1,506,201.60. It will be observed that there is a wide divergence between the majority and minority awards. We think this is to a large extent due to the method of computation adopted by the majority and minority members. Before analyzing the reports, it should be remembered that the object of the inquiry is to determine the fair and just value of the buildings and improvements of the Washington Market Company located on Reservation 7 and that the government in taking over this property is doing so with the view of continuing the business, not for the purpose of destroying the plant.

[2] With this object in view, we are of opinion that the majority of the commission reached their conclusion from a number of erroneous deductions. For example, great stress was laid upon the valuation fixed upon the property for purposes of taxation; stress was laid

upon the amount of insurance carried by the company. The amount of insurance which an owner places upon a given piece of property is little or no index of its value. One may feel impelled to carry a much larger percentage of risk than another. The amount of insurance may depend upon the character of the property insured. The probability of destruction by fire is much greater in a frame building, for example, than in a brick building, and, though the buildings are of equal value, the amount of insurance carried in the one case might be very much larger than in the other. Hence the mere fact that a building is insured for a certain amount is not necessarily an index of its value.

The valuation placed by the owner upon property for the purpose of taxation might under certain conditions furnish a basis for impeachment. The testimony of a witness as to the value of the property, who had been responsible for fixing the value for the purposes of taxation, might be impaired by production of the tax return. It also might have some weight as an admission of the value which the owner placed upon the property. But that has little bearing upon the question here to be determined. The government is not buying this property directly from the owners, nor is the action here one involving any misrepresentation on the part of the owners as to true value. The government is taking this property upon an appraised valuation as to its real and fair value; not on the basis of some tax return; not on the basis of the amount for which it may be insured; not as to what the opinion of any one particular witness shows; not on the value fixed by the owners, but on its present fair value, to be determined largely from the evidence of disinterested witnesses, with direct reference to the property as it stands.

For the same reason the stress laid by the majority of the commission upon the present value of the capital stock of the corporation has little or no relevancy to the present inquiry There may be many elements affecting the value of the capital stock, which have no bearing whatever upon the present fair value of the property. The indebtedness of the company, the competitive conditions affecting the business, the market for this class of stock, are all elements affecting its value, but in no way bearing upon the fair value of the physical property of the corporation. Likewise the limited franchise, which might be terminated at any time by Congress under a proper exercise of its powers, and which by the original act would terminate in 1969, with a full forfeiture of the entire property, prevents the consideration of capitalization as an element in determining present value. National Waterworks Co. v. Kansas City, 62 Fed. 853, 864, 10 C. C. A. 653, 27 L. R. A. 827. It may be suggested that no claim is here made for the value of the unexpired franchise.

The commission ignored the matter of historical cost in fixing its award. In this we concur, since the books of the company fail to disclose sufficient accurate information upon which to determine the historical cost, independent of replacements and depreciation.

[3] We are of opinion that the only just and legal method of arriving at the fair value of the property to be taken over by the government, under the provisions of the act, is to determine first the cost of reproduction based upon present values and deducting therefrom

the amount of depreciation. This places a correct valuation upon what the authorities term the bare bones of the plant or its physical properties; in other words, what it would cost to reproduce this building, not one that would take its place.

As a basis for our conclusions as to cost of reproduction, it will be unnecessary to review the evidence at length, since it can be deduced from a recapitulation of the testimony on this point, appearing in the record, as follows:

### Schedule A.—Recapitulation.

|  | Reproduction Cost by Market Co.'s Witnesses. | Reproduction Cost by Government Witnesses. |
|---|---|---|
| Building and miscellaneous | $1,401,934.92 | $1,042,562.62 |
| Machinery and piping | 274,848.17 | 235.524.00 |
| Insulation | 61,901.94 |  |
| Total | $1,738,685.03 | $1,278,086.62 |
| Builders' commission | 173,868.50. | 89,466.05 |
|  | $1,912,553.53 | $1,367.552.67 |
| Bond. 1½ per cent | 28,688.30 | 20,513,30 |
|  | $1,941,241.83 | $1,388,065.97 |
| Architects' fee 6 per cent | 116,474.51 | 83,283.96 |
|  | $2,057,716.34 | $1,471,349.93 |
| Less depreciation | 204,440.30 | 394,020.70 |
| Fair and just value | $1,853,276.04 | $1,077,329.23 |

We will first consider the cost of reproduction. The Market Company approached this subject in a rather scientific way. The witness H. F. Lucke, the architectural and structural engineer of the Weller Construction Company, was actively engaged from April, 1921, until the 12th day of December of the same year in the preparation of plans of the present plant, together with estimates of the cost thereof, based upon present-day rates. The plans embraced the entire building, drawn with the same accuracy as if prepared for a new building to be constructed. The measurements, quantities, and details, as set forth in the plans, correspond in every particular with those of the building itself. In other words, it is a complete plan of the building as it stands. The witness testified that, after securing the manufacturer's price for the reproduction of the machinery and the present cost of reproducing the building, "the method was merely a question of getting the quantities of the material and putting on the prices. This work was made up in almost identically the same manner that would be followed in making up the estimate for a new building, by taking off the quantities and pricing them. Everything that this plant includes was taken care of." Associated with the witness Lucke were a number of experts connected with the Weller Construction Company, who collaborated together in preparing the plans, and more especially in making the estimates as to cost.

Another witness on behalf of the Market Company, Frank L. Wagner, who testified as to reproduction cost, based his estimates upon

the drawings and plans prepared at the instance of the Weller Company, after he had established their accuracy by measurements and computation of the areas, volume of the various materials, and the number and quantity of different items embraced in the building. He testified "that his figures were the result of his endeavoring to fix the cost at which this building could be reproduced with present-day prices in accordance with the specifications as indicated upon the blueprint plans supplied him by the Weller Construction Company."

The witness Spliedt, produced by the Market Company, is the assistant general manager and estimator of the George A. Fuller Construction Company. He testified that he checked the quantities and measurements embraced in the plans by actual measurements and inspection of the building itself, and certifies that the plans and quantities furnished by the Weller Company, are correct.

These three witnesses, all of whom, it appears, were disinterested and not in any manner connected with the Market Company, testified as to the reproduction cost, further testifying that each reached his conclusions independent of the others. As a result Lucke fixed the total cost of reproduction, including builders' commission of 10 per cent., bond 1½ per cent., architects' commission 6 per cent., at $2,085,-756.04. Wagner, on the same basis of valuation, fixed the total cost at $2,037,233.11. Spliedt, by the same process, fixed the cost at $2,061,744.84.

The chief witness on behalf of the government on the subject of valuation, Frank B. Essex, arrived at his estimate of values through a different process. He took the plans prepared at the instance of the Weller Company and asked individuals to give estimates upon different portions of the work. He made no inspection of the premises for the purpose of verifying the plans, nor did he produce any detailed basis, either of his own or of the persons from whom he had received estimates upon which to establish the valuation fixed by him. He fixed the cost of reproduction, including certain items submitted by the government witness Ophuls, including builders' commission, bond, and architects' fee, at $1,471,349.93.

While the method of arriving at values, adopted by the witness Essex, are far from satisfactory, we are of opinion that his testimony can be given equal force with that of each of the other witnesses for the purpose of furnishing a basis of reaching the reproduction cost. Adopting this method of averaging the reproduction cost fixed by the four witnesses, we arrive at a cost value of $1,914,020.98. This amount corresponds closely with the appraised valuation placed upon the property by the American Appraisal Company in October, 1920, of $1,919,000.

We now approach the more difficult question of depreciation. The amount of depreciation fixed by the witness Lucke was $195,364.40; Wagner, $201,681.05; Sliedt, $218,923.05; Essex, $394,020.70. We are convinced that the estimates as to depreciation as fixed by the witnesses for the Market House Company are too low, while the percentage basis fixed by the witness Essex is too high. The method employed by him was merely to estimate the life of a building of this sort at 150 years, and, assuming that it had been constructed for 50 years,

the rate of depreciation would be 33⅓ per cent. He made no pretense of having inspected the building in its present condition for the purpose of determining its actual condition, but reached his conclusion on a theoretical percentage basis, computed upon the estimated life of a building of this sort. No consideration seems to have been given to the upkeep of the building, or to the amount of wear and tear which it has sustained. The percentage fixed seemed to be purely an arbitrary one. The witness, however, testified that from his observation the building was in excellent condition—"that it had been wonderfully kept up." He further testified that his method of ascertaining depreciation amounted to "purely guesswork."

The three witnesses for the Market House Company arrived at their estimates of depreciation through what is known as the inspection method, which consisted of an inspection of the present condition of the building in its various details and arriving at an estimate of depreciation therefrom. While unquestionably this is the proper method of fixing depreciation, there are many elements of depreciation in a building of this magnitude which would not be revealed by an inspection merely of the exposed portions of the structure. In every building there are inherent elements of depreciation, which increase proportionately with age, and cannot be discovered by mere inspection of the building itself. We are of opinion that considerable allowance should be made for this inherent depreciation. For example, take a new building, which has been occupied but a few months, while it may have sustained no physical damage therefrom, yet the processes of deterioration have begun. It is a used building, and has sustained the infirmities and prejudices which attach to secondhand property.

Inherent depreciation arises from use, deterioration of materials from age and exposure to the elements, and the wear and tear resulting from the particular business to which the property is dedicated. For example, the visible and invisible wear and tear would be more pronounced in a market house than in a well-kept and well-conducted residence. While in both instances there would be depreciation from use and exposure to the elements, it would be much greater in the case of the former than the latter. Hence the use to which a building has been subjected, together with its age and the character of wear and tear naturally resulting from such use, are all elements to be considered in fixing inherent, as distinguished from apparent, depreciation.

We are highly impressed by the testimony of the witness Miller on the subject of depreciation. This witness, produced on behalf of the government, is a civil engineer who for years has occupied the position of superintendent of buildings for the borough of Manhattan, New York. After careful examination of the building he testified as follows:

"Taking the building in its entirety, it is, of course, not new or in a condition that a building would be if it were reproduced. The walls generally are in what I would call fair condition, but show considerable deterioration. The mortar has weathered considerably, and in many parts of the walls, both on the exterior and part of the interior, where the walls themselves are visible, the joints were worn out to the extent of anywhere from one-eighth to a quarter of an inch in depth. The walls in certain parts, particularly along Ninth street and along Seventh street, indicate by cracks over the

arches and in the brickwork, more particularly between the pilasters, that there has been some uneven settlement in the building."

He then entered into detail as to the evidences of depreciation found in different portions of the structure, calling attention especially to the deterioration of the mortar to an extent that rendered possible its removal by a light instrument such as a steel knife. From his investigation he expressed the opinion "that the depreciation was somewhere between 25 and 30 per cent."

The consideration of the subject of depreciation logically involves the matter of obsolescence. The majority of the commission made a very large allowance for obsolescence. While they fixed the reproduction cost at $1,674,029.49, they allowed for depreciation and obsolescence the unreasonable figure of $741,743.37. The minority member made no allowance for obsolescence, but fixed the depreciation at $495,395.20, which, based upon the total reproduction value found by him, amounted approximately to about 25 per cent., the low figure fixed by the witness Miller. We are in accord with the minority member that obsolescence should not be independently considered in this case. The government is here taking over a business in complete and productive operation. The value to be found is of the property in that condition as it stands for the purposes for which it is used. The evidence touching the matter of obsolescence is of too indefinite a character to entitle it to consideration, and, using the language in the report of the minority member, we "can see no reason for the application of unproven, untested, speculative theories of this kind to the present value of property which has been the development for many years, which has proven to be of practical use and benefit to the community, which is functioning efficiently, and which is earning substantial income upon a large capitalization."

Obsolescence, of course, relates to structure and machinery that has become antiquated, or, more accurately speaking, out of date. But the reproduction costs arrived at in this case are based upon the reproduction of a building of exactly the same dimensions, materials, workmanship, machinery, and fixtures that have entered into the construction of the present building. It therefore follows that depreciation is the single item that should be considered in determining the amount of wear and tear that the building, machinery, and fixtures have sustained since its construction. There should therefore be no independent allowance for this more or less fictitious element of obsolescence. We have not confined our investigation of this branch of the case to the evidence relating to the depreciation of the building as a whole. Other witnesses than those whose testimony has been reviewed testified respecting the depreciation of certain parts of the structure. Considering, therefore, all the evidence in the case, we are of opinion that the depreciation in this building amounts to 25 per cent. of the reproduction cost already found, or $478,505.24, leaving a net value of $1,435,515.74.

This does not include an allowance for interest on the investment during reproduction construction. This item depends, of course, upon the length of time required for the construction of a plant such

as we are here considering. The witness Essex fixed the period at 12 months. This, we think, is entirely too short. The three witnesses who testified as to total valuation on behalf of the Market Company fixed the period required for the construction of a plant of this sort at 20 months, which we think is a very conservative estimate, especially in view of the 2-year period for construction allowed the Market Company in the original act, and from the further fact that considerably over a year was consumed in constructing the original buildings, which formed only a comparatively small part of the present structure. Basing an allowance for interest during reproduction construction on the evidence of these witnesses, we have $86,682.14, which amount should be added to the net value.

The evidence as to market value was confined largely to the testimony of one witness, who tendered himself prepared to pay $1,500,000 in cash for the property of the Market Company. He further testified that a purchase at that price would be highly profitable. The good faith of this witness is not challenged or impeached, hence must be credited in considering this branch of the case.

[4] We now come to the consideration of the question of going concern value. Going concern value was not allowed by either the majority or minority of the commission. The disallowance on the part of the commission was based upon the following ground:

"The commission holds that so-called going concern value should not be added to physical value under the plain language of the act, which clearly limits the appraisal to tangible property, as shown by the following language appearing in section 3: 'Buildings and improvements thereon and therein which were erected or made at the expense of the Washington Market Company, and which stand and remain upon said reservation; the valuation thereof to be determined as of the date of filing said award.' And again, in section 4, the act reads: 'The buildings and improvements erected and made at the expense of the said Market Company on said premises, and remaining thereon when the award is made.'"

It is unnecessary for us to consider the effect of the limitation of the original act that the "fair and just valuation of the buildings and improvements then standing on said grounds" should be the measure of compensation, had the corporation of Washington, after 30 years, elected to take over the property. The corporation of Washington is no longer in existence. If, by the present act, Congress was providing for the taking over of the property for the benefit of the District of Columbia, it might be urged that, inasmuch as the District is the successor of the original corporation, it could assert the limitations of the original act; but the property is not being taken for the use, profit, or benefit of the District. By the taking, the District loses the $25,000 annual payment by the Market House Company. It will, in the future, derive no profit or revenue whatever from the operation of this property. The taking is for the sole benefit of the United States. The act specifically declares it "to be the desire, purpose and intent of the *United States* to annul and hold for naught the lease made by Congress to the Washington Market Company, of reservation numbered seven, in the District of Columbia, and to take over unto its *own ownership, use, occupancy and control* the said grounds and build-

ings and improvements thereon and therein now held and occupied by the said Market Company."

This is a proceeding in eminent domain, to appropriate the property of the Market Company to a public use. It is an original proceeding, not depending upon any limitations contained in the prior act under which the corporation was chartered and of which it might be charged with notice. The mere fact that the present act undertakes to limit the measure of value to the "buildings and improvements erected and made at the expense of the said Market Company on said premises" has no relation to the same limitation contained in the original act.

If the matter were properly before us, we would have no doubt of the right of the Market Company to a reasonable allowance for going concern value. National Waterworks Co. v. Kansas City, supra; Omaha v. Omaha Water Co., 218 U. S. 180, 30 Sup. Ct. 615, 54 L. Ed. 991, 48 L. R. A. (N. S.) 1084; Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034; Knoxville v. Knoxville Water Co., 212 U. S. 1;[1] Water Co. v. City of Des Moines (C. C.) 192 Fed. 193; Gas & Electric Co. v. Norwich, 76 Conn. 565, 57 Atl. 746; Water District v. Waterville, 97 Me. 185, 54 Atl. 6, 60 L. R. A. 856. And this would be true notwithstanding the attempt in the present act to limit the award to the value of the "buildings and improvements erected and made at the expense of the said Market Company on said premises." Monongahela Navigation Co. v. United States, 148 U. S. 312, 13 Sup. Ct. 622, 37 L. Ed. 463.

In the latter case, Congress passed an act to condemn lock and dam No. 7, belonging to plaintiff company, in the Monongahela river. The act specifically provided that, in arriving at the amount to be paid by the United States for the property taken, the franchise of the corporation to collect toll should not be considered or estimated. The value of the franchise to collect toll was not included in the award, but the court, reversing the judgment, held that the error amounted to the taking of property without just compensation. On this point the court said:

"These are all the questions presented in this case. Our conclusions are that the Navigation Company rightfully placed this lock and dam in the Monongahela river; that, with the ownership of the tangible property legally held in that place, it has a vested franchise to receive tolls for its use; that such franchise was as much a vested right of property as the ownership of tangible property; that the right of the national government, under its grant to regulate commerce, to condemn and appropriate this lock and dam belonging to the Navigation Company, is subject to the limitation imposed by the Fifth Amendment, that private property shall not be taken for public use without just compensation; that just compensation requires payment for the franchise to take tolls, as well as for the value of the tangible property; and that the assertion by Congress of its purpose to take the property does not destroy the state franchise."

This question, however, is not before us. Neither have we jurisdiction to consider it. The commission appointed to value this property is a mere creature of Congress, and Congress had power to place any limitation upon the commission, as to the property to be valued,

[1] 29 Sup. Ct. 148, 53 L. Ed. 371.

that it might see fit. It could provide for a valuation of a part or all of the property. It could limit the valuation to the buildings and improvements as has been done in this case. This is merely an appraisement. Whether Congress can take it at the valuation thus fixed is another question.

[5] In reviewing the findings of the commission, this court has jurisdiction only to review the action of the commission within the limitations imposed upon the commission by Congress. Our power, therefore, to fix a valuation upon the property of the Market Company, is limited to the buildings and improvements, not to the intangible property value arising from the existence of a going business. Our jurisdiction is limited to an approval or revision of the award made by the commission. We undoubtedly have jurisdiction to review and correct errors of law committed below, but the commission committed no error in declining to allow for going concern value, since, as suggested, to have so done would have been an act in excess of the jurisdiction conferred upon it by Congress.

It is therefore ordered, adjudged, and decreed that the Washington Market Company be, and hereby is, awarded as a fair and just valuation for the buildings and improvements now situated on Reservation 7, as aforesaid, the sum of $1,522,197.88.