**UNITED STATES of America,**
**Appellant,**

v.

**BENNING HOUSING CORPORATION**
**et al., and Unknown Owners,**
**Appellees.**

**No. 17726.**

United States Court of Appeals
Fifth Circuit.

March 25, 1960.

Roger P. Marquis, Claron C. Spencer, Dept. of Justice, Washington, D. C., Frank O. Evans, U. S. Atty., Macon, Ga., Perry W. Morton, Asst. Atty. Gen., for appellant.

Joseph M. Williamson, Urbana, Ill., Raymond R. Dickey, Washington, D. C., W. M. Page, Swift, Pease, Davidson & Chapman, Columbus, Ga., for appellees.

Before RIVES, Chief Judge, and TUTTLE and JONES, Circuit Judges.

RIVES, Chief Judge.

This is a proceeding to establish just compensation for two "Wherry" housing projects condemned by the United States. The condemnees, Custer Road Terrace, Inc., and Benning Housing Corporation—corporations formed according to the requirements of the Wherry Act [1] expressly for the purpose of managing these projects—are beneficially owned by identical persons, thus making it possible to dispose of the case by one all-inclusive valuation.

██ The property condemned comprised leasehold estates in approximately 300 acres of land situated within the confines of Fort Benning, Georgia, together with the improvements thereon. Two separate seventy-five-year leases are involved: one, executed on March 3, 1950, and having approximately sixty-seven and one-fourth years remaining as of December 31, 1957, the date of taking; and the second, executed on September 6, 1951, and having approximately sixty-eight and two-thirds years remaining as of that date. The improvements involved were quite substantial. Roughly speaking, they consisted of 370 brick residential buildings containing 800 family dwelling units, a commercial shopping center, various utility buildings, a network of paved streets and sidewalks, and complete water and sewage systems. Under the terms of the leases, titles to all improvements remained in the lessees and, upon expiration of the leases, the lessees had the privilege of removing those improvements. Any improvements not removed at that time, however, became the property of the United States.

The primary controversy at the trial centered about the method of valuation which was to be used in the determination of just compensation. The condemnees took the position that the proper measure of compensation for their interests was reproduction cost less depreciation. This position was predicated upon three contentions: that there was no established market and, consequently, no established market value for their property; that valuation by capitalization of income was inappropriate; and that the nature of the property condemned was such that the reproduction cost approach was peculiarly appropriate. The Government, on the other hand, took issue with each of these contentions. It offered, as evidence of market value, testimony relating to the sale of three Wherry housing projects, [2] and contended that these projects were comparable to those of the condemnees. Secondly, it contended that valuation by capitalization of income was entirely appropriate to the property condemned. And, finally, it contended that the reproduction cost approach was entirely inappropriate and that evidence of reproduction cost should be excluded.

The district judge heard evidence relating to the alleged comparable sales at a special hearing prior to the trial and ruled that the sales were sufficiently comparable to warrant their admission into evidence. At the same time, however, he ruled that evidence of capitalization of income and reproduction cost was also admissible. Thus, the jury to which the case was eventually tried heard evidence relating to all three of these methods of valuation. A verdict was returned in

---

1. 63 Stat. 570 (1949), 12 U.S.C.A. § 1748 et seq.

2. The sales urged as comparable were those of Wherry housing projects at

Barksdale, Louisiana, Quantico, Virginia, and Fort Devins, Massachusetts.

favor of the condemnees in the amount of $2,171,487.[3] Since the Government had deposited only $941,000 prior to the trial, judgment was entered ordering payment of an additional $1,230,487 plus interest thereon from the date of taking.

The Government prosecutes this appeal, assigning as the primary ground therefor, the trial court's ruling that the jury could hear evidence of reproduction cost of the condemned property. Additional assignments relate to rulings made by the trial court on related, but comparatively incidental, questions.

An examination of the cases dealing with the admissibility of reproduction cost evidence reveals that, although the subject is clouded with considerable uncertainty, some pattern does emerge. Thus, it has almost uniformly been held that, absent some special showing, reproduction cost evidence is not admissible in a condemnation proceeding.[4] This rule stems from a recognition of the fact that reproduction cost evidence almost invariably[5] tends to inflate valuation. This is so because the reproduction cost of a structure sets an absolute ceiling on the market price of that structure,[6] a ceiling which may not be, and most frequently is not, even approached in actual market negotiations. When this inherently inflationary attribute of reproduction cost evidence is considered in the light of the misleading exactitude which such evidence almost inevitably imparts to a jury unsophisticated in the niceties of economics, the justification for placing substantial safeguards upon its admission is apparent.

On the other hand, it is equally well recognized that in some cases, and upon a proper showing, the admission of reproduction cost evidence is justified, and even mandatory. Within this area of substantial agreement, there is, however, some disagreement. Thus, some courts hold that reproduction cost evidence is admissible only in those cases where the indicia of value under other methods are not available.[7] Other courts seem to treat this factor as largely irrelevant.[8] But, as to three other factors governing the admission of reproduction cost evidence, there is substantial, if not complete, unanimity. These are: (1) that the interest condemned must be one of complete ownership;[9] (2) that there must be a showing that substantial reproduction would be a reasonable business venture;[10] and (3) that a proper allowance be made for depreciation.[11]

3. This verdict was based upon the implied finding that the value of the projects was $8,135,492.53 for, by the terms of the taking, the United States assumed the balance of the mortgages on the projects in the amount of $5,964,005.53. For a discussion of the power of the United States to condemn a leasehold interest subject to a mortgage, see United States v. Certain Interests in Property, 7 Cir., 1959, 271 F.2d 379, 382–384.

4. See generally, 2 Orgel, Valuation Under Eminent Domain §§ 188–199 (2nd ed., 1953).

5. Id., at § 188.

6. Id., at § 192.

7. See, e. g., United States v. 2.4 Acres of Land, 7 Cir., 1943, 138 F.2d 295.

8. See, e. g., United States v. Wise, 4 Cir., 1942, 131 F.2d 851.

9. This follows naturally from the fact that reproduction cost is related to the value of the whole, if, indeed, it is related to value at all. Messer v. United States, 5 Cir., 1946, 157 F.2d 793, provides an ideal example of the sort of case in which reproduction cost could never be admitted. In that case, the condemnee was a mere licensee upon the lands condemned and was under an obligation to remove his improvements upon notice of termination of his license. This burden upon his right to free enjoyment of his structures detracted from the value of those structures to such an extent that, for that reason alone, the absence of any reasonably close relationship between value and reproduction cost was apparent.

10. See United States v. Wise, supra, note 8; 2 Orgel, op. cit. supra, n. 4, at § 191.

11. See In re United States Commission to Appraise Washington Market Co. Property, 1923, 54 App.D.C. 129, 295 F. 950; 2 Orgel, op. cit. supra, n. 4, at §§ 196–97.

We will first deal with the Government's contention that reproduction cost evidence was not admissible because other indicia of value, i. e., comparable sales and income, were available. On this point, the Government relies upon the opinions of this Court in Stephenson Brick Co. v. United States [12] and United States v. Savannah Shipyards,[13] contending that these cases commit this Court to the view that reproduction cost evidence is not admissible where comparable sales evidence is available and are, therefore, entirely dispositive of the issue here presented.

■ An examination of those cases, however, reveals that this reliance is misplaced. The very most that they can properly be interpreted to stand for, and, indeed, even this is by way of dictum, is the proposition that where there is an established market value for the condemned property, reproduction cost evidence is inadmissible. The distinction which must be drawn is between a situation in which there is an established market value and one in which a few sales of comparable properties have occurred. In the latter situation, which is that involved in the present case, it cannot be said that a market value is established.[14] Isolated comparable sales, though themselves admissible as tending to show fair market value, are not sufficient to render reproduction cost evidence inadmissible in a case where admission is otherwise appropriate.

■ Thus, even if we assume that the dicta in Stephenson Brick and Savannah Shipyards accurately state the law of this Circuit with regard to the admissibility of reproduction cost evidence where a market value is established, the rule has no application here. Where a market value is not established, it is the primary responsibility of the trial court to determine whether reproduction cost evidence should be admitted as an aid to valuation. Here, the trial court ruled that it should and we cannot say that that decision was an abuse of discretion.

The Government's second contention raises a more serious difficulty. That contention, i. e., that reproduction cost evidence was inadmissible because the condemnees' interest did not constitute complete ownership, is rested upon two separate grounds: first, that the Government was the real owner subject only to condemnees' leasehold; and, secondly, that condemnees' rights with respect to the property were limited by the fact that the projects were subject to rent control by the F. H. A. The condemnees, on the other hand, contend: first, that their leasehold interest is tantamount to complete ownership; and, secondly, that, even though the F. H. A. had the power to set rents, it could do so only in such a way as to guarantee the Wherry sponsor a fair return on the value of his property, and, therefore, that such a power in the F. H. A. could not diminish the value of the property.

As to the first ground urged by the Government, it seems clear that the condemnees must prevail. As pointed out above, both leases had in excess of sixty-five years yet to run as of the date of taking. Though the record indicates that it is entirely possible that the improvements here involved might outlast that period, the condemnees' interest is nevertheless not limited substantially by that fact. The present value of the Government's rights sixty-five years hence with respect to those improvements is negligible.[15]

12. 5 Cir., 1940, 110 F.2d 360.

13. 5 Cir., 1944, 139 F.2d 953, rehearing denied 5 Cir., 140 F.2d 863.

14. This proposition must, of course, be interpreted in the light of the facts of this case where the sales, though comparable, are far from identical. We do not mean to lay down any rule as to how many sales constitute the establishment of a market price. That will always ultimately depend upon the facts of the particular case and the characteristics of the market involved.

15. See Orgel, op. cit. supra, n. 4, at § 122.

In order to evaluate the contentions as to rent control, a brief survey of the background of these projects seems necessary. The projects were constructed under the aegis of the Wherry Act, which was enacted on August 8, 1949, in an attempt to relieve an acute shortage of housing which existed at that time at military installations throughout the country. The Act envisioned the construction of this needed housing by private builders and its provisions were consequently specifically designed to remove what appeared to its chief proponents to be the major impediments to such construction. The then current view of the problem was concisely expressed by Senator Wherry himself:

"There are three requisites that must be provided in this legislation if it is to be successful: The program must be attractive to the builder or else you will get no construction; it must be attractive to the mortgage banker who supplies the money; the project must be made attractive to the Federal Housing Authority to enable it to set rental prices within the reach of families in the lower income brackets as well as in the higher brackets." [16]

The Wherry Act proposed to meet these requisites by providing for: (1) the elimination of land and acquisition costs by the leasing of land on military installations on long-term, irrevocable leases at nominal rentals; (2) a special form of mortgage insurance which avoided the problem created by the fact that ordinary F. H. A. mortgage insurance was unavailable because of the risk involved by reason of the location of the needed housing and the question as to the permanent nature of the military installations; and (3) F. H. A. control over the rents which could be charged for housing constructed under this plan.[17]

Considered in the light of the purposes of the Wherry Act, the proper resolution of the controversy seems clear. The condemnees' argument rests squarely upon a basic misconception of those purposes. For condemnees presuppose that the inducements offered by the Wherry Act to stimulate building, i. e., leases at nominal rentals and Government-insured mortgages, were outright gifts to the Wherry

16. Quoted in S.Rep. No. 231, 85th Cong., 1st Sess., at p. 11.

17. Insofar as the Wherry Act was designed to stimulate private construction of military housing, it was quite successful. Considerable amounts of such housing were erected on military installations throughout the country. In other aspects, however, the results of the program were less gratifying. Among the reasons for the dissatisfaction with the Wherry program were the following: (1) the probability of excessive profits in the early stages of the program; (2) the expected lack of sponsor interest in the later stages; (3) the fact that Wherry housing could not be assigned as "quarters" to military personnel; (4) the fact that the Wherry program permitted non-military personnel to live on military bases; and (5) the fact that movements of military personnel or the declining importance of military bases had led sometimes to high vacancy rates and frequent mortgage defaults. Review of Military Housing Programs, S.Rep. No. 231, p. 26, 85th Cong., 1st Sess., S.Rep. 404, p. 17, Cong.Doc.Ser. No. 11816; H.Rep. No. 913, p. 26, Cong.Doc.Ser. No. 11823, 84th Cong., 1st Sess. Consequently, on August 11, 1955, Congress enacted the Capehart Act, 69 Stat. 646 (1955), 42 U.S. C.A. § 1594, superseding the Wherry Act.

The Capehart Act provided that housing constructed on military installations after its enactment would be managed and operated by the Secretary of Defense instead of by the private builders as was the case under the Wherry Act. At the same time, it was provided that the Secretary of Defense could, in his discretion, acquire the existing Wherry housing projects. Where Capehart housing was constructed at a military installation already being served by Wherry housing, acquisition of the Wherry housing was made mandatory. This latter provision was designed to protect Wherry sponsors from losses occasioned by competition with newer Capehart housing. The present case falls into this category, condemnation having been made necessary by the construction at Fort Benning of Capehart housing and the failure of negotiations between condemnees and the Government for a voluntary sale.

sponsors for which the Government would not, and, indeed, could not, exact a return.[18] Such is not the proper interpretation of that Act. These inducements were offered in return for low-cost housing. It is clear that the policy has consistently been one of allowing a return based upon original cost rather than reproduction. Rent increases were sanctioned only to offset rising operating costs and not to compensate for increased reproduction costs. The Act did not contemplate that sponsors would recover reproduction costs on a sharply rising market. And there was nothing unfair in its failure to do so. By insuring the mortgages on the projects, the Government assumed the risk of loss on a declining market. In such a situation, respect for the public interest practically required that no benefit should accrue to the sponsors as a consequence of inflation.[19]

This conclusion is reinforced by the fact that the record is totally devoid of any unequivocal evidence that the project here involved would be reproduced by private investors at the risk of private capital. That reproduction would not occur under those circumstances in the vast majority of the cases is almost certain. Indeed, the Wherry Act was originally passed primarily because private investment was not providing such projects. We find nothing in the record to indicate that the situation at Fort Benning differs from this norm.

We conclude, therefore, that this is not a proper case for valuation on the basis of reproduction cost.[20] This means, of course, that the case must be tried on the basis of comparable sales, capitalization of income and original cost. Though it is apparent in a case such as this that the problem of valuation on the basis of these factors alone is a difficult one, that is unavoidable. The admission of reproduction cost evidence, though perhaps making it easier to reach *some* solution, only made the *proper* solution more difficult.

Since the case is to be tried again, we find it unnecessary to comment upon many of the other errors urged by the Government. In the interest of sound judicial administration, however, it does seem wise to point out one error which occurred at the last trial and which might occur again. Over the Government's objection, the condemnees were permitted to introduce evidence related to a purported rent increase as to this housing which allegedly was instituted by the Government immediately after it took the projects. This purported increase was based upon the assignment of some of the housing to military personnel as Government quarters and the consequent forfeiture of the quarters allowance of such personnel. Such an ar-

---

18. It is this fact, i. e., the existence of the inducements, which completely distinguishes the Washington Market case, supra, note 11, from the present case. The Washington Market Co. property was not subsidized as was that in this case. And, consequently, there were no limits upon the rents which the Company could charge for the property. Thus, the Washington Market case involves a situation where the requirement of complete ownership in the condemnee was met.

19. This conclusion does not conflict with the holding of the Supreme Court in Offutt Housing Co. v. Sarpy County, 1956, 351 U.S. 253, 76 S.Ct. 814, 100 L.Ed. 1151, relied upon by the condemnees.

The Offutt Housing case held merely that a Wherry sponsor was subject to taxation by the state in which his project was located on the basis of the full value of that project. That holding is entirely without bearing upon the question presented here, i. e., whether, and under what conditions, the value of such a project may be measured in terms of its current reproduction cost.

20. We therefore find it unnecessary to pass upon the objections made by the Government to condemnees' showing with respect to depreciation. This question is not necessary for the success of this appeal and, in view of our holding, cannot arise again upon a second trial.

rangement does not constitute a rent increase in any proper sense and no testimony should have been admitted relating to it.[21]

Reversed and remanded.

---

21. This follows from the very nature of the quarters allowance given to military personnel. The allowance is the same throughout the country, like Government travel allowances, and varies, not according to space or type of property (house or apartment) occupied, but according to the rank and the dependency situation of the particular personnel involved. Thus, the allowance is totally unrelated to rental value. To hold otherwise, is to adopt the anomalous position that the very same apartment may have one rental value if occupied by a colonel and a far lesser value if occupied by a lieutenant.