296 F.2d 264
 UNITED STATES of America, Appellant and Cross-Appellee,
v.
CERTAIN INTERESTS IN PROPERTY IN CUMBERLAND COUNTY, State of
NORTH CAROLINA; and Unknown Owners, Appellees, and Bragg
Investment Company, Inc., Bragg Development Company, Inc.,
and Bragg Management Company, Inc., Appellees and Cross-Appellants.
 No. 8280.
 United States Court of Appeals Fourth Circuit.
 Argued April 13, 1961.
Decided Nov. 6, 1961.
 
 Roger P. Marquis, Atty., Dept. of Justice, Washington, D.C. (J. Edward Williams, Acting Asst. Atty. Gen., Ramsey Clark, Asst. Atty. Gen., Julian T. Gaskill, U.S. Atty., Raleigh N.C., and Robert R. McLeod, Atty., Dept. of Justice, Washington, D.C., on brief), for the United States, appellant and cross-appellee.
 L. P. McLendon, Greensboro, N.C. (Claude C. Pierce, Jr., Greensboro, N.C., John J. Geraghty, Raleigh, N.C., McLendon, Brim, Holderness & Brooks, Greensboro, N.C., and Poyner, Geraghty, Hartsfield & Townsend, Raleigh, N.C., on brief), for owners, appellees and cross-appellants.
 Before SOPER and BOREMAN, Circuit Judges, and HARRY E. WATKINS, District Judge.
 BOREMAN, Circuit Judge.
 
 
 1
 This is a condemnation proceeding initiated by the United States on November 1, 1957, to acquire the equity in certain rental housing property located at Fort Bragg, North Carolina, and constructed under the original Title VIII of the National Housing Act, commonly known as the 'wherry Act,' 63 Stat. 570 (1949), 12 U.S.C.A. 1748 et seq. On June 12, 1958, the District Court appointed a commission pursuant to Rule 71A(') of the Federal Rules of Civil Procedure, 28 U.S.C.A., to determine the amount of compensation to which the owners were entitled. After extensive hearings, the commissioners filed a report, finding that the fair market value of the condemned property was $16,986,989, from which was subtracted the sum of $15,196,018.37, that being the stipulated amount, as of November 1, 1957, of an outstanding mortgage to be assumed by the Government. The owners were awarded $1,790,970.63 for their equity. Later, at the request of the District Court, a supplemental report was filed by the commission, but that report simply confirmed the original. The District Court then made extensive findings of fact which differed in certain aspects from the findings of the commissioners, and drew therefrom conclusions of law.
 
 
 2
 The United States appeals from the District Court's substitution of its own findings and conclusions for those of the commission and the resulting increase in the award to the owners. There is a cross-appeal by the owners, who contend that the District Court erred in failing to consider and give effect to additional factors which would further increase the award.
 
 
 3
 The property which was condemned consists of 2000 family housing units, a shopping center composed of eight stores, seven related service buildings, ten miles of paved highways, electric street lights, and complete water, sewer and electric service. It is located on a 516.89 acre tract of land owned by the United States and included in the Ofrt Bragg military reservation; the tract, in two sections, was leased by the Government to the defendant-owners for a period of seventy-five years, one section from April 1950, the other from September 1951. The condemned property is completely landscaped and has playground and park areas. In effect, it is a self-contained city for about 6000 persons. The lease permitted the lessees to remove, at the termination of the lease, all improvements placed on the land.
 
 
 4
 The commission found that the improvements on the leased lands had a remaining economic life of thirty years as of the date of taking and that the value of the owners' residual interest in the lease and improvements thirty years from the date of taking would be negligible. The 'reproduction-cost-less-depreciation' method and 'comparable-sales' method of evaluating the property were rejected by the commission in favor of the 'capitalization-of-income' method. The owners argue that the District Court erred in instructing the commission as indicated below[1] regarding consideration of evidence of replacement or reproduction cost. They apparently agree with the Government, however, that capitalization of income is a proper method of evaluating the property in the instant case, though they contend that it is not necessarily the only method which might properly be employed. No objection is made to the use of the Inwood Compound Interest Coefficient Table for computing the exact capitalized value of the property. The primary dispute is whether the District Court was empowered to find and justified in determining, contrary to the commission's finding, that the remaining economic life of the condemned property at the time of taking was 35 years instead of 30 years. Except for the change in the period of the remaining economic life, all the other elements, including the six per cent rate of interest, were used by the District Court in the evaluation formula exactly as found by the commission.[2]
 
 
 5
 The commission concluded that, even though the lease had approximately seventy years to run at the time of the taking of the property, the residual value, after thirty years, for the leasehold and improvements was negligible as of November 1, 1957. With this conclusion the District Judge disagreed. He was convinced that the commission had erred further in determining a remaining economic life of only 30 years for the improvements on the leased land and found a remaining economic life of 35 years which, as we shall point out, is supported by the evidence. Though the theoretical basis for the court's ultimate determinatioin is not clearly explained in its opinion[3] and findings, we are unable to say that the court's final judgment, increasing the award to the owners to $2,707,220.63, is clearly erroneous. After finding an increased period of remaining economic life, the District Court used the same rate of interest in applying the capitalization-of-income formula as used by the commission with its finding of a shorter period of remaining economic life. The interest rate was one of the factors to be determined, depending in part upon a consideration of the increased risk involved in spreading the return of capital over the longer period of time. In view of the testimony of each of the expert witnesses as to a selection of the proper interest rate to be employed in determining value based upon the capitalization-of-income method, we cannot say that the court erred in using the same capitalization rate adopted by the commission.[4] It is reasonable to conclude that an increase in the period of remaining economic life would tend to reduce the residual value of the leasehold estate; further, that since there was evidence upon which to base a determination of a period of remaining economic life greater than 30 years, a finding to that effect would reduce the value, if any, of the residual estate remaining after the termination of economic life. Implicit in the District Judge's award is a finding that the November 1, 1957, value of any residual estate at the end of the period of economic life, as extended by him to 35 years, would be negligible.
 
 
 6
 In addition to its reported opinion, the District Court prepared an unreported statement of its findings of fact and conclusions. In this statement the testimony of the Government witness Cantwell, a real estate appraiser, is analyzed, characterized as chimerical, and shown to be premised, in its crucial aspect dealing with the remaining economic life of the condemned property, almost entirely on speculation which has no apparent support from other evidence in the record. It is from Cantwell's testimony alone that the commission found and determined a remaining economic life of 30 years. The District Court noted that Cantwell based his opinion on 'his market information' that 'a typical purchaser of Wherry equities was an individual or syndicate; that such individuals are normally mature people of approximately forty years old or better.' He further speculated that, because of the advanced age of the theoretical purchasers, they would want to recover their investment within a relatively short period of time and would not be interested in property with a long economic life. Yet, as the District Court points out, Cantwell had earlier written in his appraisal report that there has been no outright sales of Wherry housing to his knowledge. At no point does Cantwell give the source of his 'market information' about typical investors and their probable ages.
 
 
 7
 Cantwell further testified that, in his opinion, no prudent investor would want to risk his funds in a venture such as the Fort Bragg project unless he could recover his investment, in addition to earning an income thereon, within a reasonably short time in view of the effect of technological development on military planning and the probability that Fort Bragg would not always be able to provide sufficient numbers of personnel to occupy the Wherry housing. The District Judge, however, points out that Fort Bragg is as permanent as any military post could possibly be. Furthermore, the Commandant of the Fort had, subsequent to the completion of the Wherry housing, issued a certificate of need to authorize
 
 
 8
 Remaining Capitalization
economic interest
 life rate
50 years 6 1/2%
40 years 6 1/2%
50 years 7 %
45 years 7 %
40 years 6 %
34 years 5 1/2%
30 years 6 %
 
 
 9
 the construction of additional housing for millitary personnel under a later version of Title VIII of the National Housing Act, 69 Stat. 646 (1955) as amended (referred to by counsel as the Capehart Act), 12 U.S.C.A. 1748 et seq., 42 U.S.C.A. 1594.
 
 
 10
 The District Court, in its unreported findings, further explains that:
 
 
 11
 'It is apparent that the witness (Cantwell) did not observe the correct test for the determination of fair market value and just compensation. His approach considered only the attitude of the 'typical purchaser' and did not consider the views of the seller. The true test of fair market value is what price will be agreed upon by a willing seller and a willing buyer neither of whom is under a compulsion to sell or buy. See U.S. v. Miller, 317 U.S. 369 (63 S.Ct. 276), 87 L.Ed. 336 (1943.'
 
 
 12
 'In short, the witness Cantwell takes the property which he says has a physical life of fifty years and for the purpose of determining its economic life, ignores all the factors which really determine economic life such as type of construction, provision for maintenance, protection against abuse by tenants, continuing need and demand, the lack of competition, the high level of occupancy, the collectibility of rents, and 'the implied obligation of the military to provide tenants for the project insofar as the military had tenants to provide.' * * *'
 
 
 13
 Seven expert appraisers appeared before the commission-- four for the owners and three for the Government. The owners' witnesses estimated a remaining economic life of 50 years, 40 years, 40 years and 34 years, respectively. The Government experts chose 50 years, 45 years and 30 years, respectively, as their estimates of the remaining economic life of the property. The finding by the District Court of a 35-year remaining economic life of the property was apparently made after carefully and properly considering the factors just mentioned which the judge found were not properly considered by the commission and Cantwell.
 
 
 14
 The Government contends that the District Court had no authority to substitute its own findings for those of the commission. As a general rule, the facts as determined by the finder thereof are accepted by the reviewing court. In its brief the Government argues that 'the resolution of questions of credibility of witnesses is peculiarly a matter for the factfinder who saw them testify, heard the inflection of their voices, and observed their relative candor in answering questions.' We find no fault with this statement of principle. However, where the factfinder bases a finding on opinion testimony of an expert witness whose stated reasons for his opinion are patently unsound and without support in the record, the reviewing court should reject, as clearly erroneous, the finding based on such testimony. See United States v. Twin City Power Co., 248 F.2d 108 (4th Cir.1957), certiorari denied, 356 U.S. 918, 78 S.Ct. 702, 2 L.Ed.2d 714 (1958); United States v. Waymire, 202 F.2d 550 (10th Cir.1953); United States v. 44.00 Acres of Land, 234 F.2d 410 (2d Cir.), certiorari denied, 352 U.S. 916, 77 S.Ct. 215, 1 L.Ed.2d 123 (1956); and United States v. Twin City Power Co. of Ga., 253 F.2d 197 (5th Cir.1958). The holding of this court in United States v. Twin City Power Co., the case cited first above, is almost directly in point and controls the instant case. We reject the Government's contention that our decision in Cunningham v. United States, 270 F.2d 545 (4th Cir.1959), certiorari denied, 362 U.S. 989, 80 S.Ct. 1078, 4 L.Ed.2d 1022 (1960), overruled Twin City, supra.
 
 
 15
 Chief Judge Parker, writing for this court in the Twin City case, said, 248 F.2d at 112:
 
 
 16
 'We review the District Judge, not the commissioners; and under Rule 52(a) we may not set aside his findings unless they are clearly erroneous. When he has set aside the findings of a master or commissioners, we must give consideration to the fact that they saw and heard the witnesses and that he did not, and we must pass upon his findings with this in mind; but, unless we can then say that his findings are clearly erroneous when viewed in this light, we must accept them. In the case before us, we cannot say that the findings of the judge were clearly erroneous. On the contrary, we think that he has demonstrated that they rest upon a reasonable basis and that his overruling of the report of the commissioners and adopting a valuation different from theirs should be sustained.'
 
 
 17
 Though there is language in Cunningham which, when isolated from the rest of the decision, might indicate a retreat from Twin City (248 F.2d 108), the holding of Cunningham does not conflict with Twin City or our holding in the instant case. The rule governing these cases can be simply stated: The District Judge has the authority and duty to review the findings of the commission, and such findings must be accepted by him unless he considers them clearly erroneous. Upon review of the District Court's findings and judgment, we must first determine whether or not the District Judge erred in accepting or rejecting the findings of the commission. The next step is to decide whether or not the substituted findings of the Judge are properly supported by the evidence. Thus, where the evidence before the commission is in virtual equilibrium and the preponderance for one side or the other is slight, the commission's findings could not be rejected by the District Court merely because the judge preferred the opposite line of evidence, which, if accepted, would support other findings; in such a situation where the commission's findings are based on substantial, though conflicting, testimony, we would be compelled to hold that the District Court erred if the commission's findings were rejected. Applying the rule to Twin City, Cunningham and the instant case, it is apparent that there is no conflict. In Twin City and in the instant case, the respective findings of the commissioners are not supported by the evidence; their findings were thus clearly erroneous and were properly set aside by the District Courts. It would have been error in each instance if the District Court had not modified the commissioners' findings to conform to the evidence. In Cunningham, the evidence, though equivocal in supported the findings of the commission; such findings were thus not clearly erroneous, and the District Court erred in setting them aside and substituting its own findings therefor.
 
 
 18
 The owners-defendants, in their cross-appeal, argue primarily (1) that the District Court erred in failing to designate forty years as the remaining economic life of the condemned property; (2) that the value of the property as a 'going concern' was not adequately considered; and (3) that the District Court erred in instructing the commission to consider evidence of reproduction cost less depreciation 'only when there has been a showing by a preponderance of evidence that a reasonable, prudent person would reproduce the projects on November 1, 1957, for the figure or amount given as replacement or reproduction cost.'[5] The first two points do not require extended discussion. It will suffice to say that the District Court was well within the range of evidence concerning remaining economic life and was not clearly erroneous in adopting a remaining economic life of 35 years for the condemned property. Also, the value of the property as a 'going concern' was certainly included in the selection by the commission and the District Court of the rate of interest used in the capitalization-of-income formula. The very use of the capitalization-of-income method of evaluation assumes the valuation of the property as a going concern; to add a separate item labeled 'going concern value' would result in duplication.
 
 
 19
 With respect to the third point, it is noted that the owners cite a number of Fourth Circuit cases for the proposition that evidence of reproduction cost of the buildings is properly to be considered in the evaluation of condemned property.[6] It is contended that the rule in this circuit is different from that expressed in the Fifth Circuit cases of United States v. Benning Housing Corp., 276 F.2d 248 (5th Cir. 1960), and United States v. Leavell & Ponder, inc., 286 F.2d 398 (5th Cir. 1961), and by the Tenth Circuit in Buena Vista Homes, inc. v. United States, 281 F. d 476 (10th Cir. 1960). These cases are either distinguishable from the line of Fourth Circuit cases cited by the owners or they fall within the language used by this court in earlier opinions. The three cases just cited deal with Wherry housing and Benning and Buena Vista state that the reason for holding that reproduction cost should not have been considered or relied upon it that it was clearly shown that no prudent investor would have reproduced the buildings as of the date of taking. Leavell & Ponder, Inc., supra, follows Benning. The District Court's instruction in the instant case did not preclude the introduction and consideration of evidence of replacement cost; it simply required a showing that, in effect, willing vendees and vendors would, under the circumstances, consider such information relevant if they were negotiating a sale at arm's length.[7] In other words, this court has in the past favored a broad rule of admissibility and consideration of evidence in condemnation cases; the only condition has been that there be a showing that willing vendees and vendors would deem such evidence or information relevant in their negotiations. It seems plain that a showing as required by instruction XII to the effect that a reasonable investor would reproduce the project for the amount given as reproduction or replacement cost would be required before a willing vendee would consider such a figure relevant in his negotiations with a willing vendor. Such is the purport of the earlier decisions of this court cited and relied upon by the owners, and we see not conflict. The District Court's instruction XII was properly given.
 
 
 20
 The owners contend that the District Court's determination of fair market value of the property is 'manifestly unjust,' but we find no merit in the contention. The points raised in its presentation are repetitious and we do not deem it necessary to discuss them.
 
 
 21
 For the foregoing reasons, the judgment of the District Court is affirmed.
 
 
 
 [1]
 'XII. The Commissioners are instructed that replacement cost, or reproduction cost, may be considered only when proper deductions are made for physical and economic depreciation and obsolescence. Moreover, the Commissioners are instructed that replacement cost, or reproduction cost less depreciation, may be considered only when there has been a showing by a preponderance of evidence that a reasonable, prudent person would reproduce the projects on November 1, 1957, for the figure or amount given as replacement or reproduction cost.'
 
 
 [2]
 The District Court adopted the commission's finding of an annual stablized income of $1,250,000, which was based upon 97% occupancy of the housing project. (Pursuant to agreement by counsel for the owners and the Government, all expert witnesses based their calculations on the assumption that the housing units would remain 97% occupied throughout economic life.)
 
 
 [3]
 185 F.Supp. 555 (E.D.N.C.1960)
 
 
 [4]
 The selection of a six per cent capitalization rate of interest in determining value of a 35-year remaining economic life has support in the record. The seven expert appraisers used the following rates in connection with their estimates of economic life:
 
 
 [5]
 The entire instruction is found in n. 1, supra
 
 
 [6]
 United States v. Wise, 131 F.2d 851 (4th Cir.1942); Cade v. United States, 213 F.2d 138 (4th Cir.1954); United States v. 25.406 Acres of Land, 172 F.2d 990, 993 (4th Cir.1949); also cited for this point are United States v. Certain Interests in Property in Champaign County, State of Illinois, 271 F.2d 379 (7th Cir.1959); Clark v. United States, 155 F.2d 157 (8th Cir.1946); In Re United States Comm. to Appraise Washington Market Co. Property, 54 App.D.C. 129, 295 F. 950 (D.C.Cir.), appeal dismissed at request of United States, 265 U.S. 598, 44 S.Ct. 634, 68 L.Ed. 1199 (1924); Thayer-West Point Hotel Co. v. United States, 106 Ct.Cl. 60, 64 F.Supp. 565 (Ct.Cl.1946), modified as to interest, 329 U.S. 585, 67 S.Ct. 398, 91 L.Ed. 521 (1947)
 
 
 [7]
 Evidence of reproduction or replacement costs was introduced before the commission, but such evidence was not relied upon because, as stated in its report, the commission was 'not satisfied by a preponderance of the evidence that a reasonable and prudent man would reconstruct or reproduce the property as of November 1, 1957, for the reproduction costs as estimated by the witnesses.' The commission also found that 'the reproduction costs were completely out of line and inflationary.' The District Court's instruction XII was first relied upon by the commission for its decision to disregard evidence of replacement or reproduction costs. The decision of the Fifth Circuit in United States v. Benning Housing Corp., 276 F.2d 248 (5th Cir. 1960), was handed down between the issuance of the commission's first report and its supplemental report and was cited in the latter document as additional support for the commission's action in failing to consider evidence of reproduction or replacement cost in determining the fair market value of the condemned property